426 So.2d 1122 (1983)
AMERADA HESS CORPORATION, et al., Appellants,
v.
Catherine Norred MORGAN, et al., Appellees.
CHEVRON U.S.A., INC., a California Company, Appellant,
v.
Catherine Norred MORGAN, et al., Appellees.
Nos. AK-112, AK-238.
District Court of Appeal of Florida, First District.
February 3, 1983.
Rehearing Denied February 11, 1983.
*1123 Peter J. Winders and Eurich Z. Griffin of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for appellants in No. AK-112.
William D. Ryals of William D. Ryals, P.A., Gainesville, for appellant in No. AK-238.
Thomas A. Roberts and Joanne L. Bober of Moore & Peterson, Dallas, Tex., and Alan B. Bookman of Emmanuel, Sheppard & Condon, Pensacola, for appellees.
LARRY G. SMITH, Judge.
This appeal is from a final judgment entered in the trial court after remand pursuant to this court's decision in Morgan v. Amerada Hess Corporation, 357 So.2d 1040 (Fla. 1st DCA 1978).[1] The final judgment appealed quieted title in appellees with respect to an undivided one/eleventh interest in certain land in Santa Rosa County, and awarded monetary relief to appellees by way of payments for oil, gas, and other minerals extracted from the land by the several defendants. We affirm.
*1124 We first consider the contention that the trial court erred in ruling that it had no jurisdiction to confirm the conveyance made by the guardian of appellees' father's estate some twelve years before the instant litigation was commenced.[2] It is undisputed that although a petition for court confirmation of the guardian's conveyance was prepared, it was never filed with the court, and no court order (which was required to give validity to the sale, under Section 745.05, Florida Statutes (1963))[3] was ever obtained. The trial court applied the rule that the jurisdiction of the court to belatedly confirm the sale and conveyance by the guardian terminated upon the death of the ward (appellees' father) in 1973, two years before the filing of this suit. The court ruled correctly.
The Second District, in In Re Estate of Pearson, 192 So.2d 89 (Fla. 2nd DCA 1966), applied the same rule (that death of the ward terminates the guardianship) in a case involving the assignment of dower, holding that the power of the court to set aside dower terminated on the death of an incompetent widow, even though her guardians' election to take dower had been filed in her behalf prior to her death. See, also, 39 Corpus Juris Secundum, Guardian and Ward, § 41. Appellants cite Northeast Bank of Clearwater v. Bentley, 413 So.2d 480 (Fla. 2nd DCA 1982), as authority for the proposition that the court does have the power to confirm a sale "after-the-fact." In Northeast Bank, a ward, Mrs. Bentley, after regaining competency, challenged the validity of an agreement made during her incompetency by her guardian for division of corporate stock jointly owned by the ward and her husband. The trial court ruled that since no court order had been obtained approving the division of the stock under statutes then in effect, Mrs. Bentley was entitled to recover in her action for conversion against the bank which had cashed a check for sale of half the stock. In so ruling, the trial court prohibited the bank from asserting in defense that although Mrs. Bentley's name and that of her husband appeared as payees on the check, only her husband was the intended payee, since the agreement called for Mrs. Bentley to receive a certificate in her name alone for the other one-half of the stock. In reversing, the Second District pointed out that the guardianship proceeding had not been terminated, nor had Mrs. Bentley's guardian been discharged. Therefore, the court reasoned, it was not too late for the guardian to seek a confirmation of the stock division agreement. We agree, as argued by appellees, that Northeast Bank does not alter the rule applied by the trial court in this case, in that the guardianship was terminated by court order dated August 2, 1973, prior to the commencement of this suit.[4]
We next consider the contention that appellees were not entitled to the relief awarded because of failure to join indispensable parties. Appellants refer to Thomas E. McMillan and Elvira Cochran McMillan, who were joined as parties defendant in this case but as to whom, as pointed out in our prior decision, Morgan v. Amerada Hess Corporation, supra, on petition for rehearing, 357 So.2d at 1045, appellees' action was barred by the statute of limitations because they were not joined as defendants in this case until June 1, 1976, a date subsequent to the expiration of the saving clause provided in Section 95.022, Florida Statutes (1975). The McMillans' interest arose as follows: Title to a portion of the property (tracts 2 and 3), including the disputed one/eleventh interest, became vested in Robert W. Blackman and his wife, *1125 Lola B. Blackman. The Blackmans conveyed a mineral lease to Thomas McMillan, granting the exclusive right, at the lessee's expense, to produce oil, gas and other minerals on the property, subject to the obligation to pay the Blackmans one/eighth of the oil and gas produced, free of production costs. The McMillans, in turn, assigned their production rights and duties (referred to as a "working interest") to Amerada Hess Corporation, in return for which the corporation agreed to pay the McMillans 27.5 percent of the oil and gas produced (in addition to the one/eighth royalty to the Blackmans). An unrecorded letter agreement between the McMillans and Amerada Hess, referred to in the recorded assignment of the McMillans' working interest, provided that the 27.5 percent overriding royalty payable to McMillans would be reduced to the extent that the assigned lease interest covered less than the entire mineral estate in tracts 2 and 3. Appellants urge that the McMillans were indispensable parties in that any ruling which affected the Blackmans' interest would, of necessity, affect McMillans' interest under their assignment to Amerada Hess, and that the final judgment entered by the trial court, invalidating the "working interest" transferred by the McMillans to Amerada Hess to the extent of the one/eleventh interest awarded to appellees, necessarily brings into operation the "proportionate reduction" letter agreement, under which Amerada Hess will be entitled to reduce the McMillans' "overriding royalty" to the extent of one/eleventh.
An indispensable party is one whose interest will be substantially and directly affected by the outcome of the case. W.F.S. Co. v. Anniston National Bank of Anniston, 140 Fla. 213, 191 So. 300 (Fla. 1939). We conclude, however, that appellants have not shown that the McMillans are indispensable parties under the foregoing test. First, as pointed out by appellees, after the McMillans' assignment to Amerada Hess, the McMillans no longer had an obligation to any party with respect to tracts 2 and 3, and were the owners and holders of an overriding royalty interest, which is a nonpossessory right to receive money.[5] They retained no right to enter upon the land to develop or produce minerals, and Amerada Hess, as the owner of McMillans' "working interest," assumed only the obligation to pay McMillans" overriding royalty of 27.5 percent, and to pay the obligation to the Blackmans of one/eighth of the oil and gas produced, free of production costs. Secondly, it is clear that under the judgment fashioned by the trial court, the rights and interests of the McMillans have not been and will not be affected. This is so because the final judgment provides that the McMillans will continue to receive their full 27.5 percent overriding royalty interest. Furthermore, although the obligation of Amerada Hess to the McMillans will be effectively reduced (under the proportionate reduction agreement) by the amount which the appellees' title reduces the title of Amerada Hess (27.5 percent minus one/eleventh times 27.5 percent), the judgment provides that the difference (or shortfall) due to the McMillans will be paid by Amerada Hess out of revenues which otherwise would have been payable to appellees. The trial court's judgment thus permits the McMillans to retain all of their rights, but at the same time permits Amerada Hess to reduce its obligation by charging appellees with their proportionate share of the overriding royalty to be paid by Amerada Hess to the McMillans. In sum, the McMillans receive no less, and Amerada Hess is required to pay them no more, than if the McMillans had remained as parties defendant.
We have not overlooked appellants' contention that a party is indispensable to an action which would cancel any portion of a *1126 mineral lease. Appellees respond that the cases cited by appellants stand for the proposition that the owner of a fractional mineral interest (whether a royalty carved from a landowner's interest or an overriding royalty created out of the estate of the working interest owner) is indispensable if his interest is dependent upon the validity of a conveyance which would be wholly extinguished if the claimant should prevail.[6]Hilton v. Atlantic Refining Co., 327 F.2d 217 (5th Cir.1964); Calcote v. Texas Pacific Coal & Oil Co., 157 F.2d 216 (5th Cir.1946), cert. den. 329 U.S. 782, 67 S.Ct. 205, 91 L.Ed. 671 (1946); Keegan v. Humble Oil and Refining Co., 155 F.2d 971 (5th Cir.1946). Although the facts in Hilton required their presence in that case, the court acknowledged that nonparticipating royalty owners ordinarily are not indispensable to a trespass to try title suit. 327 F.2d at 219. In Hudson v. Newell, 172 F.2d 848 (5th Cir.1949), mineral interest owners whose source of title was invalidated were nevertheless found not to be indispensable parties where the court was able to fashion a judgment which permitted the owners to continue to receive the benefits of their interests. We conclude that the McMillans were not indispensable parties.
Appellants contend also that this court's prior decision holding that action against the McMillans was barred by the statute of limitations "perfected" the McMillans' title. It follows, they assert, that the after-acquired title doctrine operates to perfect the title of Amerada Hess. We agree, however, with appellees' argument that the after-acquired title doctrine has no application in this case. The doctrine, based upon estoppel, operates to prevent a grantor from asserting against his grantee and those claiming under him a preexisting outstanding title subsequently acquired by the grantor. Murray v. Newsom, 111 Fla. 193, 149 So. 387 (Fla. 1933); Daniell v. Sherrill, 48 So.2d 736 (Fla. 1950); Cahill v. Chesley, 189 So.2d 818 (Fla. 2nd DCA 1966). The prior decision of this court has no effect on the title of any interest in real property owned by the McMillans. At the time of the action against them they were the owners only of an overriding royalty interest arising from the oil and gas lease encumbering the property. Our prior decision affected only the McMillans' overriding royalty interests, since that is all they owned at the time of the litigation. They did not own the leasehold interest, that having been assigned to Amerada Hess. It would thus be inaccurate to characterize our decision preventing appellees from suing the McMillans as one perfecting the "working interest" represented by the oil and gas lease, originating from the Blackmans, and reposing in Amerada Hess at the time of the litigation in which the Blackmans and Amerada Hess were defendants.
As for appellants' contention that the trial judge erred in allowing recovery of a "working interest" when appellees complaint sought only "royalties," we find no merit in this contention. We agree with appellees that the term "royalties" as used in the amended complaint is not susceptible of such a precise definition as to operate as a bar to the relief awarded to appellees in this case. As appropriately pointed out by appellees, the relief granted by the trial court is in conformity with the rule of P & N Investment Corp. v. Florida Ranchettes, Inc., 220 So.2d 451 (Fla. 1st DCA 1968).
Finally, with respect to appellants' contention that there were unresolved factual issues which precluded summary judgment quieting title in appellees, we find no basis for reversal on this ground. The "unresolved" factual issues raised by appellants focus upon their characterization of actions of the appellees which, in appellants' view, would raise the defense of estoppel and *1127 laches, precluding recovery.[7] We disagree. These purported actions or inactions on the part of appellees do not raise factual issues. The trial court correctly determined, in our opinion, that no actions or inactions on the part of appellees rise to the level of legal or equitable defenses to the claims asserted by them in this proceeding.
For the foregoing reasons, the judgment appealed is AFFIRMED.
JOANOS, J., and SHAW, LEANDER J., Jr., Associate Judge, concur.
NOTES
[1] A full understanding of this litigation requires a reading of the necessarily lengthy recitation of facts contained in this court's prior opinion, 357 So.2d 1040, which are incorporated by reference. In our prior decision, we held that the statute of limitations, Section 95.12, Florida Statutes (1963), when considered in connection with Section 95.20(1), Florida Statutes (1973) [repealed by Ch. 74-382, Laws of Florida, with a saving clause, Section 95.022, Florida Statutes (1975)] did not bar a quiet title action by appellees 16 [sic] years after their father's guardian conveyed their father's interest in the property without court approval, where the action was begun within seven years after their father's death; and we further held that the action was not defeated or barred by Sections 95.21 or 95.22, Florida Statutes (1975).
[2] The conveyance by the guardian was made in 1963; the suit was filed in 1975. Our prior opinion, 357 So.2d at 1043, erroneously indicates a time span of sixteen years between these events, rather than twelve years.
[3] Section 745.05, Florida Statutes (1963), containing authority for the guardian of an incompetent to sell property for the best interest of the ward at public or private sale, specifically provided: "... but no title shall pass until the sale is authorized or confirmed by order of the county judge; ... ."
[4] Carl Norred, the former guardian, was joined as a defendant in his individual capacity, not as guardian.
[5] Technically, a royalty right is a right only to receive a certain portion of the oil produced, either in kind or in specie, free of exploration and production costs, 1 William and Meyers, Oil and Gas Law § 301; Hardwicke, Problems Arising Out of Royalty Clauses in Oil and Gas Leases in Texas, 29 Texas L.Rev. 790 (1951). However, the term is often used to signify other interests. See, Annotation, 4 A.L.R.2d 492.
[6] The underlying mineral lease upon which the McMillans' interest depends, originating in the Blackmans as lessors or grantors, has not been wholly extinguished by the final judgment in this case, but has been invalidated only to the extent of an undivided one/eleventh interest. The cases relied upon by appellants on this point are therefore not dispositive of the issue here.
[7] Although, as pointed out in our prior decision, appellees took no action with respect to the property in question for what may seem to be an inordinate period of time, appellants can point to no event, notice, or occurrence which might be viewed as giving rise to a duty or obligation on their part to come forward and assert any claim to the property. Although three of the four appellees had notice that sale of their father's interest in the property was under consideration by the guardian, they were specifically advised that the sale would be approved by the court. They received no formal notice of the guardianship proceeding, were not listed as persons related to the ward, and of course never received any notice pertaining to court approval of the sale, since such approval was never sought by the guardian. It is clear that there was no action or inaction on appellees' part relied upon by Amerada Hess or other appellants to their detriment, therefore no basis for an estoppel against appellees. It is undisputed that the failure to have the guardian's sale confirmed by the court was through appellants' own inadvertence, and they were charged with knowledge of the lack of compliance with the statutory proceedings indispensable to the passage of title by the guardian. See, Sapp v. Warner, 105 Fla. 245, 141 So. 124 (1932). It is noted that interest in the property in question for its oil producing capabilities commenced some four to five years prior to the death of appellees' father so that there was ample time, if the defendants had so desired, to seek to perfect their title by securing a confirmation of the guardian's conveyance while the incompetent ward remained alive.

Appellants can point to only one "action" on the part of appellees that even remotely approaches the kind of conduct that might be considered in connection with an estoppel or waiver defense. Appellees, who reside in Houston, came to Pensacola for their father's funeral in 1973, at which time they learned of the conveyance of their father's interest in the property. As indicated in our prior opinion, 357 So.2d at 1042, after the funeral Card Norred explained that the proceeds from the sale were needed to pay their father's funeral and burial expenses, to which appellees consented. Within two years they filed this quiet title suit. We reject appellants' argument that this conduct by appellees amounts to waiver, acquiescence, or ratification providing grounds for defense by appellants. It is apparent from exhibits in the record that virtually all of the appellants acquired their interests prior to the death of appellees' father, therefore there could have been no "reliance" on appellees' actions at their father's funeral or thereafter. Furthermore, it is not shown in behalf of any defendant that any action or inaction was taken in reliance upon appellees' acquiescence in the payment of their father's funeral and burial expenses from the proceeds of the prior guardian's sale. Furthermore, it is not shown that appellees ever had actual control of the proceeds of sale, nor that they had knowledge of their potential claims to the property at the time they agreed to payment of funeral and burial expenses therefrom. In fact, the money used to pay the funeral expenses was derived from both the sale and unrelated rentals of the property prior to the sale.