**CAREY CANADA, INC., Plaintiff,**

v.

**CALIFORNIA UNION INSURANCE CO., et al., Defendants.**

**Civ. A. No. 85–1640 JHP.**

United States District Court,
District of Columbia.

Sept. 26, 1990.

---

Karen Lee Bush, Stephan G. Wielgoz, Anderson Kill Olick & Oshinsky, Washington, D.C., Nicholas J. Zoogman, Anderson, Russell, Kill & Olick, New York City, for Carey Canada, Inc.

Lynn Bregman, Wilmer, Cutler & Pickering, Clifford Bruce Hendler, Carla P. Welsh, Colton & Boykin, Washington, D.C., for California Union Ins. Co.

Deirdre Reidy Horton, Bromley, Brown & Walsh, Rockville, Md., James Wilson Greene, II, Bromley, Brown & Walsh, Washington, D.C., for Columbia Cas. Co. and Employers Ins. of Wausau.

William J. Bowman, Hogan & Hartson, Andrew Klingenstein, Hogan & Hartson, Washington, D.C., for First State Ins. Co.

Daniel Clinton Sauls, Steptoe & Johnson, Washington, D.C., for Home Ins. Co.

Randell Hunt Norton, Thompson, McGrail, O'Donnell & Harding, Washington, D.C., for Intern. Ins. Co. and U.S. Fire Ins. Co.

James Patrick Schaller, M. Elizabeth Medaglia, Jackson & Campbell, P.C., Washington, D.C., for Nat. Union Fire Ins. Co. of Pittsburgh.

Deirdre Reidy Horton, Bromley, Brown & Walsh, Rockville, Md., James Wilson Greene, II, Bromley, Brown & Walsh, Washington, D.C., Phillip J. McGuire, Marybeth Jacobsen, Nancy Gleason, John Laetz, Dowd & Dowd, Ltd., Chicago, Ill., for Northbrook Excess & Surplus Ins.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### Introduction

This case is presently before the Court for renewed consideration of plaintiff Carey Canada, Inc.'s motion for partial summary judgment on the "trigger of coverage" issue. We previously deferred ruling on this motion pending supplemental briefing on the issues of when and how asbestos causes property damage.[1] *See* Memorandum Opinion, Mar. 31, 1988, at 17–19, 1988 WL 169287. Also before the Court is defendant First State's motion to strike and for sanctions,[2] which concerns the so-called Fulbright & Jaworski memorandum, attached as Exhibit C to plaintiff's reply memorandum in support of its motion for partial summary judgment on the "trigger of coverage" issue. Finally, plaintiff and defendants First State and National Union have cross-moved for partial summary judgment. At issue is whether an exclusion contained in the policies these defendants issued for the year 1977–78 bars coverage in this case.

The Court will address each of these motions in turn. As we earlier held, principles of Florida insurance law govern our interpretation of the policy provisions. *See* Memorandum Opinion, Mar. 31, 1988, at 8–10. For any issue on which Florida has taken no "specific position," we will consult general principles of insurance law. *General Accident, Fire & Liability Assurance Corp. v. Liberty Mutual Insurance Co.*, 260 So.2d 249, 252 (Fla.Dist.Ct.App.1972).

### 1. The "Trigger of Coverage" Issue

■ Carey Canada asks us to rule that, where liability in an underlying case against it is based on property damage caused by asbestos-containing material ("ACM"), "such damage presumptively was continuous ... from installation of that material through [its] removal or containment, and all policies ... in force during that period are triggered and provide coverage." Pl.Reply Mem.in Supp.of Mot.for Part.Summ.Judg. at 2. Defendant insurers could avoid this trigger only by proving that no property damage occurred during the periods for which they issued coverage. *See id.* Thus, the burden of proof in this regard would fall on the insurers, not the insured. For the reasons that follow, we are unable to grant plaintiff's motion.

As we stated in our earlier decision, resolution of this motion turns on the nature and timing of the asbestos contamination process in buildings.[3] *See* Memorandum Opinion, Mar. 31, 1988, at 15. In response to that ruling, the parties have submitted great volumes of material in support of their respective positions. Unfortunately, defendants largely ignored our directive that no further briefing be submitted on the issue of *whether* asbestos causes property damage. *See id.* at 15, 20. Their unhelpful conduct left us with a Hobson's choice: ignore their submissions completely or sift through reams of irrelevant material in an effort to decipher which of their arguments and exhibits were pertinent to the issues at hand. Although tempted to take the former course, we have, in this instance, given defendants the benefit of the doubt. Any future disregard of our

---

**1.** Since that time, Carey Canada and the Celotex Corporation have settled their dispute with Aetna Casualty & Surety Co., the primary carrier. *See Carey Canada, Inc. v. Aetna Casualty & Sur.*, No. 84–3113, Stipulation of Dismissal, May 13, 1988. Therefore, only one of the two consolidated cases remains. Carey Canada is the sole plaintiff in this action and, four of the original nine excess insurers having settled out, only five defendants remain. They are: California Union Insurance Company, Columbia Casualty Company, Employers Insurance of Wausau, First State Insurance Company, and National Union Fire Insurance Company of Pittsburgh. Together, these insurers issued excess liability coverage to Carey Canada for the years 1977–82. *See infra* note 4.

**2.** Aetna and First State filed this motion, in which Northbrook Excess & Surplus Insurance, United States Fire Insurance Company, and International Insurance Company subsequently joined. At present, however, only First State remains a party to this motion.

**3.** Despite defendants' continued insistence to the contrary, we adhere to our earlier conclusion that asbestos can cause property damage. *See* Memorandum Opinion, Mar. 31, 1988, at 15.

orders, however, may warrant the imposition of sanctions pursuant to Rule 11, Fed. R.Civ.P., or 28 U.S.C. § 1927 (1988).

Apparently, defendants' position is that property damage occurs only when asbestos fibers become airborne, and that this occurrence is sporadic and rare. Defendants deny plaintiff's contention that ACM "continuously emits asbestos fibers" and "deteriorates with age." Dfs.Jt.Subm'n at 13. In support of their position, defendants have introduced, *inter alia,* affidavits of several experts and various publications, including the EPA's most recent pronouncements on the subject. This evidence, defendants argue, raises a genuine issue of material fact concerning the nature and timing of asbestos contamination, and therefore precludes us from determining that a continuous trigger of coverage presumptively applies. *See id.*

Carey Canada, on the other hand, continues to argue that friable ACM, even if undisturbed, will deteriorate continuously over time, releasing asbestos fibers in the process. Plaintiff further contends that commonplace, minor disturbances of ACM —caused, for example, by routine maintenance and water leaks—are sufficient to cause a release of asbestos fibers into the air. Accordingly, it argues, a presumptively continuous trigger should apply. Plaintiff relies on, *inter alia,* expert and lay testimony introduced in property damage cases similar to those currently pending against it, as well as government and technical publications describing the hazards associated with ACM in buildings and airborne asbestos fibers. *See generally, e.g.,* Pl.Subm'n.

In order to prevail on its motion, Carey Canada must demonstrate that no genuine dispute exists as to whether asbestos contamination occurs continuously from the date of installation through the date of containment or removal. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202

(1986). While the word "continuous," in this context, may not denote an everyday occurrence, plaintiff at least must show that contamination occurs with such high frequency that we may presume it to have occurred during each policy period at issue here.[4] This plaintiff has failed to do.

Based on all the evidence submitted, we find that the following "material facts exist without substantial controversy," Fed.R. Civ.P. 56(d): (1) property damage, as defined in defendants' policies, results from (a) installation of ACM; and (b) release and reentrainment[5] of asbestos fibers into the air; and (2) release and reentrainment occur when ACM or asbestos fibers are damaged or disturbed. *See, e.g.,* EPA Study of Asbestos–Containing Materials in Public Buildings, Feb.1988; EPA Guidance for Controlling Asbestos–Containing Materials in Buildings, June 1985; Morse Aff. at 5; *see also In re Asbestos Insurance Coverage Cases,* Statement of Decision Concerning Phase V–A Issues at 9 (Cal.Super.Ct. Jan. 24, 1990) [hereinafter *Phase V–A Decision* ]; *id.* at 13 ("Release of asbestos material and fiber and reentrainment are all property damage events because each is an act of contamination which makes the building more hazardous."). A genuine issue exists, however, as to whether release and reentrainment occur continuously. Defendants have presented "significantly probative" evidence that ACM does not release asbestos fibers as it deteriorates with age. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *see, e.g.,* Bragg Aff. at 6; Morse Aff. at 5, 6. Their evidence also indicates that incidents of fiber release due to damage and disturbance may be infrequent—perhaps several years apart. *See, e.g.,* Bragg Aff. at 7, 14–15; Morse Aff. at 7. While Carey Canada vehemently contests the validity of this evidence, *see* Pl. Reply to Dfs.Subm'n at 13–18, 21–26, it is not our role at this stage "to weigh the evidence and determine the truth of the matter." *Liberty Lobby,* 477 U.S. at 249,

---

**4.** Defendants' policies were in effect during the following years: California Union (1981–82); Columbia Casualty (1978–79); Wausau (1980–81, 1981–82); First State (1977–78, 1978–79, 1979–80); and National Union (1977–78, 1979–80).

**5.** Reentrainment occurs when settled releases are disturbed.

106 S.Ct. at 2510; *see also Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1465 (D.C.Cir. 1990) (court must "grant all reasonable inferences to the nonmoving party") (citation omitted). That function must await a trial. *See Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510.

At present then, all we can conclude is that defendants' duty to defend is triggered if the allegations of an underlying complaint would permit proof that any of the following occurred while their policies were in effect: (1) installation of ACM in the building; (2) release of asbestos fibers into the air of the building; or (3) reentrainment of settled releases of fibers into the air of the building. *See Phase V-A Decision, supra,* at 16. Similarly, defendants' duty to indemnify is triggered if plaintiff can establish that any of these events occurred while defendants' policies were in effect. *See id.* Because there is a genuine dispute as to whether fiber release and reentrainment occur continuously, we are unable to adopt the presumptive continuous trigger plaintiff seeks.[6] *See id.* at 15–17. While mindful that insurance policies must be "liberally construed in favor of the insured," *Feldman v. Central National Insurance Co.*, 279 So.2d 897, 898 (Fla.Dist. Ct.App.1973), we emphasize that the insured bears "the burden of proving that the alleged loss ... occurred within the period that the policy was in force." *Banco Nacional de Nicaragua v. Argonaut Insurance Co.*, 681 F.2d 1337, 1339 (11th Cir.1982); *see Exhibitor, Inc. v. Nationwide Mutual Fire Insurance Co.*, 494 So.2d 288, 289 (Fla.Dist.Ct.App.1986), *review denied*, 503 So.2d 327 (Fla.1987); *see also American States Insurance Co. v. Piasecki*, 392 So.2d 1369, 1370 (Fla.Dist.Ct. App.1981); *Universal Underwriters Insurance Corp. v. Reynolds*, 129 So.2d 689, 691 (Fla.Dist Ct.App.1961). Because it remains unclear whether property damage caused by ACM is a continuous process, Carey Canada has not yet satisfied that burden. *Compare Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1047 (D.C. Cir.1981), *cert. denied*, 455 U.S. 1007, 102

S.Ct. 1644, 71 L.Ed.2d 875 (1982) (continuous trigger applies because bodily injury caused by asbestos begins with inhalation of fibers and ends with manifestation); *accord Phase V-A Decision, supra,* at 15 ("The continuous trigger adopted ... in the bodily injury cases was based upon a finding that bodily injury from asbestos exposure was a continuous process beginning with first exposure."). Accordingly, plaintiff's motion for summary judgment on the trigger of coverage issue is denied. We turn now to defendant First State's motion to strike and for sanctions.

## II. *First State's Motion to Strike and for Sanctions*

■ This motion concerns the so-called Fulbright & Jaworski memorandum, which plaintiff attached as Exhibit C to its reply memorandum in support of its motion for partial summary judgment on the trigger of coverage issue. Prepared in 1983 at the request of the Asbestos Claims Council—of which Aetna, First State's parent, was a member—this memorandum discusses case law relevant to the question of insurance coverage in asbestos property damage lawsuits. Carey Canada attached the memorandum as evidence that First State's "own counsel concluded [both] that the underlying asbestos building cases alleged property damage," and that the policy language at issue here provided coverage. Pl.Reply Mem.in Supp.of Mot.for Part.Summ.Judg. at 19.

In a joint submission, defendants immediately objected to this exhibit, as well as to certain insurance industry drafting documents attached as Exhibits D and E to the same reply memorandum. The exhibits, they asserted, failed to comply with the requirements of Rule 56(c) and (e), Fed.R. Civ.P. (describing materials to be considered on motion for summary judgment). Subsequently, First State moved to strike the Fulbright & Jaworski memorandum from the record and for sanctions against Carey Canada. We deferred ruling on this motion pending our resolution of plaintiff's motion for partial summary judgment. *See* Memorandum Opinion, Mar. 31, 1988, at 22.

---

6. Plaintiff will have the opportunity at trial to establish by a preponderance of the evidence that asbestos contamination either is literally continuous or occurs with such frequency as to make a continuous trigger appropriate.

Although we are now prepared to rule on the motion, we note that the parties have launched a premature battle concerning the ultimate admissibility of the Fulbright & Jaworski memorandum under the Federal Rules of Evidence.[7] They also dispute whether the memorandum's introduction would violate the so-called Wellington Agreement, to which First State and Carey Canada are parties.[8] As the record now stands, these issues simply are not ripe. Plaintiff exhibited the memorandum for a very narrow purpose, and we ultimately found no need to consider it in ruling on the trigger of coverage issue.[9] Accordingly, we decline to address the parties' broader arguments on this subject at this time.

Nonetheless, because First State raised a timely objection, we will grant its motion to strike on the narrower ground that the Fulbright & Jaworski memorandum was neither attached to an affidavit nor certified, as required by Rule 56(e), Fed.R. Civ.P. *See Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 38 n. 10 (D.C.Cir. 1987); 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 2722, at 56–61, and cases cited therein (1983 & Supp.1990) [hereinafter *Federal Practice*]. Its motion for sanctions, however, is denied without prejudice. We now turn to the cross-motions for summary judgment, which concern an exclusion clause contained in two of the policies at issue in this case.

### III. *The Cross–Motions for Summary Judgment and The "Endorsement Seven" Exclusion*

First State and National Union's 1977–78 policies follow form to Northbrook policy no. 63 003 744, the lead umbrella policy for that year. *See Carey Canada, Inc. v. California Union Ins.*, Nos. 83–1105 and 86–1142, slip op. at 2 n. 1 (D.D.C. May 7, 1985) (Pratt, J.); First State policy no. 924634 (policy follows the "terms, definitions, exclusions and conditions" of the Northbrook policy); National Union policy no. 1189777 (policy follows the "terms and conditions" of the Northbrook policy). Endorsement seven of Northbrook's policy reads, in part:

A. In consideration of the premium charged, it is understood and agreed that this insurance shall not apply to:

1. The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances[.]

First State and National Union argue that "[t]he underlying asbestos building suits against plaintiff seek to recover the cost of removing, nullifying or cleaning-up an allegedly contaminating substance—asbestos," and that therefore, the Court must conclude that "the plain language of" this exclusion bars "the coverage plaintiff now seeks." Dfs.Mem.in Supp.of Mot.for Part. Summ.Judg. at 2. Carey Canada has cross-moved for a judgment that the exclusion does not apply. Both sides submit, and we agree, that the exclusion is unambiguous.[10] For the reasons that follow, we grant Carey Canada's motion.

First, we hold that First State has waived the right to raise the exclusion by failing to plead it as an affirmative defense or otherwise signal an intention to rely on it at any point prior to the filing of this motion. "An insurer's defense to suit be-

---

7. First State contends that the document is "[e]vidence of conduct or statements made in compromise negotiations." Fed.R.Evid. 408; *see infra* note 8. Plaintiff denies this contention and argues that the document is admissible as an admission of a party-opponent. *See id.* 801(d)(2).

8. First State contends that the Fulbright & Jaworski memorandum was commissioned with an eye toward developing what ultimately became the Wellington Agreement. Plaintiff stresses that the Wellington Agreement, in its final form, did not encompass property damage cases such as the one before us now. Thus, there is a question as to whether the Agreement's confidentiality provisions apply to the memorandum.

9. Nor have we considered the insurance industry drafting documents attached as Exhibits D and E to plaintiff's reply memorandum.

10. "If the language of a contract is unambiguous ..., its construction is for the court, not the jury." *Ellenwood v. Southern United Life Insurance Co.*, 373 So.2d 392, 394 (Fla.Dist.Ct. App.1979) (citations omitted).

cause of an exclusion in its policy is an affirmative defense." *Posigian v. American Reliance Insurance Co.*, 549 So.2d 751, 753 n. 2 (Fla.Dist.Ct.App.1989) (citing *Peninsular Life Insurance Co. v. Hanratty*, 281 So.2d 609 (Fla.Dist.Ct.App.1973)); *see* 5 *Federal Practice, supra*, § 1271, at 434 (1989). Accordingly, the exclusion must be "set forth affirmatively" in the insurer's answer. Fed.R.Civ.P. 8(c).

Failure to plead an affirmative defense generally "results in the waiver of that defense and its exclusion from the case." 5 *Federal Practice, supra*, § 1278, at 477; *see, e.g., Camalier & Buckley–Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d 407, 420 n. 92 (D.C.Cir.1975); *Consolidated Mortgage & Finance Corp. v. Landrieu*, 493 F.Supp. 1284, 1293 (D.D.C.1980). Although this "rule is not applied automatically," 5 *Federal Practice, supra*, § 1278, at 491, its application is justified in this case. First State and National Union filed their motion for partial summary judgment over three years after this action began. At no point prior to that time—either in its answer or in response to discovery requests—did First State indicate an intention to rely on the endorsement seven exclusion.[11] Moreover, Carey Canada promptly challenged First State's right to rely on the exclusion. In light of these circumstances, we hold that First State

failed to raise the exclusion in a timely manner, and that any defense based on this exclusion is waived.[12] *See Canal Insurance Co. v. Earnshaw*, 629 F.Supp. 114, 119 (D.Kan.1985) (factually similar case); 5 *Federal Practice, supra*, § 1278, at 498–501 (where an "unpleaded affirmative defense has not been tried by the 'express or implied consent' of the parties, ... the court may decide not to permit the issue to be litigated.").

■ Second, entirely aside from our resolution of the waiver issue, the endorsement seven exclusion does not bar coverage in this case. Insurance companies bear the burden of demonstrating that a particular exclusion bars coverage. *See, e.g., Exhibitor*, 494 So.2d at 289 (citation omitted). Moreover, it is well-established that insurance policies must be "liberally construed in favor of the insured...." *Feldman*, 279 So.2d at 898; *see also Ellenwood v. Southern United Life Insurance Co.*, 373 So.2d 392, 395 (Fla.Dist.Ct.App.1979). Furthermore, it is imperative that we read an exclusion in light of its broader context, rather than focus on its language in isolation. *See General Accident*, 260 So.2d at 252. In so doing, we must accord policy language "a reasonable, practical and sensible interpretation," not "a strained, forced or unrealistic" one. *Id.* at 253. Fi-

11. First State's answer merely states that "[t]he claims ... are not property damage claims within the meaning of the terms, limitations, definitions, conditions and exclusions of the [relevant] policies...." First State's Answer, ¶ 8. This paragraph can hardly be construed as raising the endorsement seven exclusion, which makes no reference to "property damage claims." *See* 5 *Federal Practice, supra*, § 1274, at 455–56 (although "[a]n affirmative defense may be pleaded in general terms," it must give "plaintiff fair notice of the nature of the defense.") (footnotes omitted); *see also* Fed.R. Civ.P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and *direct*.") (emphasis added). *Compare Bull's Corner Restaurant v. Director of Fed. Emergency Management Agency*, 759 F.2d 500, 502 (5th Cir.1985) (where defendant's answer sufficiently referred to the precise exclusion at issue, technical failure to comply with Rule 8(c) was not fatal, as plaintiff suffered no unfair surprise). Moreover, in response to interrogatories filed over one year after the commencement of this case, First State failed to identify the exclusion with sufficient

particularity. *See* Dfs.Reply Mem.in Supp.of Mot.for Part.Summ.Judg. at 4–5, n. 6 (First State responded "that it relied on the terms, definitions, exclusions and conditions in the underlying policies that could exclude coverage...."). *Compare Bull's Corner*, 759 F.2d at 502 (plaintiff was aware of the relevance of the exclusion, despite defendant's failure to plead it pursuant to Rule 8(c)).

12. We also doubt that National Union has satisfied the requirements of Rule 8(c). *See* National Union's Answer at 11, 15th defense ("Plaintiff's claims ... are barred ... by the terms, conditions, and exclusions of [National Union's] policies...."). However, in response to interrogatories, National Union indicated its intent to rely on the endorsement seven exclusion. *See* Dfs.Reply Mem.in Supp.of Mot.for Part. Summ.Judg. at 4 & n. 6. While the question of waiver in this context seems less clear cut, we find it unnecessary to resolve the issue, since partial summary judgment for plaintiff is warranted on independent grounds. *See infra.*

nally, and perhaps most important, as between two or more reasonable and conflicting interpretations of a provision, we are required to adopt "that interpretation which sustains the claim for indemnity, or which allows the greater indemnity...." *Ellenwood,* 373 So.2d at 395; *see, e.g., Nixon v. United States Fidelity & Guaranty Co.,* 290 So.2d 26, 29 (Fla.1973); *see also Restatement (Second) of Contracts,* § 206 (1981) ("Interpretation Against the Draftsman").

With these principles in mind, we turn to the language of endorsement seven. The endorsement, which is uncaptioned, consists of three paragraphs. Paragraph A contains seven subparagraphs, or exclusions, one of which is A.1, the clause defendants claim excludes coverage in this case. These exclusions are set out in the margin below.[13] As discussed more fully below, all seven pertain to oil and gas operations. Similarly, paragraph B refers to operations performed on oil or gas leases, and excludes coverage for, *inter alia,* saline substances contamination. Paragraph C, entitled "Definitions," also makes numerous references to oil and gas operations.

Defendants deny, however, that the endorsement is limited to oil and gas operations. They assert that, in addition to paragraph A.1, two other subparagraphs, A.5 and B.4, make no reference to such operations. Paragraph A.5 excludes coverage for damages claimed by a "co-owner of the working interest arising from operations." Paragraph B.4 excludes coverage for injury "arising out of the saline substances contamination."

Despite defendants' assertions, Carey Canada has demonstrated that these terms, as well as others used in the endorsement, "are terms of art associated with the oil and natural gas industry...." Pl.Mem.in Opp.to Dfs.Mot.for Part.Summ.Judg. at 11; *see* Pl.Reply Mem.in Supp.of Cross–Mot.for Part.Summ.Judg. at 3–6. The term "working interest" plainly refers to an interest acquired by a lessee under an oil or gas lease. *See Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1319–21 (7th Cir. 1988); *Amerada Hess Corp. v. Morgan,* 426 So.2d 1122, 1125 (Fla.Dist.Ct.App.), *petition for review denied,* 436 So.2d 97 (Fla. 1983); *Bardill v. Holcomb,* 215 So.2d 64, 65 (Fla.Dist.Ct.App.1968); *see also* 46 *Words & Phrases* at 280–81, and cases cited therein (1970 & Supp.1990). In practically all producing oil and gas leases, there is what is called a "working interest," usually seven-eighths of what is produced, owned by the lessee or his assigns, and a "royalty interest," usually one-eighth of what is produced, owned by the lessor or his assigns. *In re Randolph's Estate,* 175 Kan. 685, 266 P.2d 315, 319 (1954). We are aware of no alternative meaning to the term "working interest," and see no reason to attach one to endorsement seven. Moreover, "the saline substances contamination" is clearly a term of art used in the oil and natural gas drilling industry.[14] *See T J Service Co. v. United States Fidelity & Guaranty Co.,* 472 S.W.2d 168, 174 (Tex. Civ.App.1971).[15]

---

**13.** Paragraph A excludes coverage for the following:

1. The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances;

2. Loss of, damage to, or loss of use of property directly or indirectly resulting from subsidence caused by subsurface operations ...;

3. Removal of, loss of or damage to subsurface oil, gas, or any other substance ...;

4. Loss of hole and any in-hole equipment, including fishing costs;

5. Damages claimed by any co-owner of the working interest arising from operations ...;

6. Any cost of expenses incurred by or at the request of the named Insured or any co-owner of the working interest in connection with controlling or bringing under control any oil, gas or water well which becomes out of control ...;

7. Loss or damage to drilling rigs, drilling or production platforms....

**14.** Salt water contamination is a common oil well drilling problem. *See Cox v. United States,* 537 F.2d 1066 (9th Cir.1976); *Greyhound Leasing & Fin. Corp. v. Joiner City Unit,* 444 F.2d 439 (10th Cir.1971). Salt water disposal wells are used to return salt water produced with oil to a formation below the oil-water contact line, or to some other formation, so as to prevent surface pollution. *Cumberland Operating Co. v. Ogez,* 769 P.2d 105, 107 (Okl.1988).

**15.** Nor is there any doubt that "fishing," as used in endorsement seven, refers to retrieving drilling tools and broken pipe from an oil and gas well hole. *See Miller v. Rowan Cos.,* 815 F.2d 1021, 1023 (5th Cir.1987); *Bond–Johnson Explo-*

Defendants have made no attempt to rebut these definitions. Accordingly, applying the principles of construction enumerated above, we conclude that paragraph A.1 of endorsement seven does not bar coverage in this action. There is no genuine dispute that the exclusion, when read in the context of the entire endorsement, applies only to oil and gas operations, not property damage, including abatement costs, caused by asbestos. *See* Fed.R.Civ.P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2510, 91 L.Ed.2d 265 (1986); *Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. Under the maxim *noscitur a sociis*, "general and specific words capable of analogous meaning when associated together take color from each other," and "the general words are restricted to a sense analogous to the specific words." *Transcon Trailers, Inc. v. Northland Insurance Co.*, 436 So.2d 380, 381 (Fla.Dist.Ct.App.1983) (citation omitted). Since every other exclusion described in paragraph A refers to oil and gas drilling operations, paragraph A.1 must be read the same way. Thus, the clause unambiguously excludes only those removal, nullifying, and clean-up costs associated with "seeping, polluting or contaminating substances" incident to such operations.

Obviously, the underlying "property damage" cases against Carey Canada do not involve oil and gas drilling operations; instead, they arise out of the installation of ACM in the claimants' buildings. Therefore, to the extent that these claimants may seek to recover the costs of removing, nullifying, or cleaning-up asbestos contained in their buildings, such costs are not excluded from coverage under endorsement seven's paragraph A.1. Accordingly, First State and National Union's motion for summary judgment must be denied, and Carey Canada's cross-motion must be granted.

*ration, Inc. v. Schlumberger Technology Corp.*, 580 F.2d 391, 391–92 (10th Cir.1978). Similarly, it is clear from the context that the words "hole" and "in-hole," as used in the endorsement, refer to an oil or gas well hole. *See Goswick v.*

*Conclusion*

Based on the foregoing, we hold:

(1) that plaintiff's motion for partial summary judgment on the trigger of coverage issue is denied;

(2) that defendant First State's motion to strike and for sanctions is granted in part and denied in part;

(3) that the motion of defendants First State and National Union for partial summary judgment is denied; and

(4) that plaintiff's cross-motion for partial summary judgment on the "Endorsement Seven" exclusion issue is granted.

An Order consistent with the foregoing has been entered this day.

ORDER

Upon consideration of plaintiff's motion for partial summary judgment on the trigger of coverage issue, defendants' opposition thereto, defendants' motion to strike and for sanctions, the opposition thereto, the cross-motions for partial summary judgment of plaintiff and defendants First State and National Union, the oppositions thereto, and the entire record herein, and for the reasons stated in an accompanying Memorandum Opinion entered this day, it is by the Court this 25th day of September, 1990,

ORDERED that plaintiff's motion for partial summary judgment on the trigger of coverage issue is denied; it is

ORDERED that defendant First State's motion to strike is granted and for sanctions is denied without prejudice; it is

ORDERED that the Clerk of the Court shall strike from the record Exhibit C to plaintiff's reply memorandum in support of its motion for partial summary judgment on the trigger of coverage issue, filed July 27, 1987; it is

*Employers' Casualty Co.*, 440 S.W.2d 287, 290 (Tex.1969) (referring to oil well hole as "hole"); *Westbrook v. Watts*, 268 S.W.2d 694, 695 (Tex. Civ.App.1954) (referring to oil well hole as "hole").

ORDERED that the motion of defendants First State and National Union for partial summary judgment is denied; it is

ORDERED that plaintiff's cross-motion for partial summary judgment on the "Endorsement Seven" exclusion issue is granted; and it is

FURTHER ORDERED that counsel for the parties shall appear before the Court for a status call on this matter on October 16, 1990 at 9 a.m., and shall be prepared to discuss the future course of this litigation.