**GREYCOAT HANOVER F STREET LIMITED PARTNERSHIP, et al., Appellants,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, et al., Appellees.**

No. 93–CV–1064.

District of Columbia Court of Appeals.

Argued Jan. 4, 1995.

Decided April 24, 1995.

---

Stephen M. Seeger, Washington, DC, for appellant.

Robert L. Hoegle, with whom Thomas F. Bardo, New York City, was on the brief, for appellee Liberty Mut. Ins. Co.

Sidney G. Leech, E. Charles Dann, Jr., and Stephen E. Marshall, Baltimore, MD, filed a brief for appellee Maryland Cas. Co.

Peter K. Tompa, with whom Charles E. Leasure, III, Washington, DC, was on the

brief, for appellee Pennsylvania Mfrs' Ass'n Ins. Co.

Before FERREN and RUIZ, Associate Judges, and KERN, Senior Judge.

RUIZ, Associate Judge:

Appellant Greycoat is the defendant in at least two suits alleging damage to downtown properties neighboring property owned by Greycoat, on which an oil tank was pierced in May of 1988. In this suit, Greycoat sought a declaratory judgment requiring three insurance companies to provide a defense for Greycoat against the plaintiffs in the underlying actions. The trial court granted summary judgment for the appellees, Liberty Mutual Insurance Company, Maryland Casualty Company, and Pennsylvania Manufacturers' Association Insurance Company ("PMA"). Because Greycoat's notice to all three insurance companies of the pending lawsuits was late as a matter of law, we affirm the judgment of the trial court.

### I.

Greycoat is the owner of property located at 1331 F Street, Northwest, in Washington, D.C. Through its agent, Schal Associates Mid–Atlantic, Greycoat entered into contracts in the spring of 1988 with Schnabel Foundations Company, and Metrex Excavating, Inc., for construction at the property on F Street. Schnabel contracted to perform ground retention work for excavation, called sheeting and shoring, and Metrex contracted to perform the excavation and backfill work, including the removal of any existing underground oil tanks. The contracts required Metrex and Schnabel to obtain general liability insurance and to include Greycoat as an additional insured under the policies. Prior to beginning work, both parties were required to produce certificates of insurance evidencing that Greycoat was an additional insured, although neither was required to produce the actual policy for Greycoat to review.

Schnabel purchased a general liability policy from Liberty Mutual, and supplied Greycoat with certificates of insurance listing Greycoat as an additional insured. Those certificates were signed by Liberty Mutual and dated March 30, 1988, April 21, 1988, and June 7, 1988. Metrex purchased a general liability policy from PMA for the period of June 1, 1987, to June 1, 1988, to which Greycoat was an additional insured. Upon termination of that policy, Metrex purchased a similar policy from Maryland Casualty. Greycoat was never actually added to the Maryland Casualty policy as an additional insured, although an agent of an independent brokerage, allegedly without the authority of Maryland Casualty, produced a certificate of insurance naming Greycoat as an additional insured. Based upon the production of the certificates, both Metrex and Schnabel began their work.

Topographic drawings of the property site included in the contract signed by Metrex and Greycoat depicted the existence of an underground storage tank in the alley behind 1331 F Street. Metrex failed to remove the tank at the appropriate time. For reasons not clear from the facts established in the trial court, on May 12, 1988, Schnabel drove two H-piles through and pierced the underground tank.[1]

In the months and years following the puncture, Greycoat took several steps to protect itself from liability. Shortly after the incident, Greycoat contracted for the isolation and removal of the contamination caused by the punctured oil tank. In January 1990, in anticipation of suits by its neighbors, known for our purposes as the "Akridge" plaintiffs, Greycoat hired the law firm of Skadden, Arps, Meagher, Slate, and Flom, to initiate a litigation strategy. Later that spring, Greycoat and counsel met with representatives of the Akridge plaintiffs to discuss the possibility of an early settlement. With those efforts unavailing, on July 17, 1990, the Akridge plaintiffs filed suit. A few months later, on October 25, 1990, another action was

---

1. Greycoat states for the first time in its appellate brief that the tank was depicted on the map and site plan provided to Schnabel. Schnabel depicted the tank on its own sheeting and shoring drawings, but the tank did not appear on Schnabel's final revision. That final revision was used by Schnabel's field forces to install H-piles.

filed, known as the "Westory" suit. The Westory suit also alleged property damage from the puncture and the subsequent migration of oil. Greycoat did not notify Liberty Mutual, PMA, and Maryland Casualty that Greycoat was being sued, and request a defense, until December 20, 1990, December 26, 1990, and March 20, 1991, respectively. Each insurance company refused to defend Greycoat in the Akridge and Westory suits. When Greycoat sought a declaratory judgment to force a defense by the appellees, the trial court granted summary judgment, and this appeal followed.

## II.

■ This court reviews the trial court's grant of summary judgment *de novo,* conducting an independent review of the record to determine whether the appellees were entitled to judgment as a matter of law. *Northbrook Insurance Co. v. United Services Automobile Ass'n,* 626 A.2d 915, 917 (D.C. 1993). To sustain the judgment, there must be no genuine issue of material fact. *Byrd v. Allstate Insurance Co.,* 622 A.2d 691, 693 (D.C.1993). Moreover, the court is free, under *de novo* review, to affirm the order for reasons different from those cited by the trial court, as long as the grounds are apparent from the record and were pleaded by the

parties. *See Dale Denton Real Estate, Inc. v. Fitzgerald,* 635 A.2d 925, 927 (D.C.1993). We affirm the trial court's judgment on the ground that Greycoat did not provide timely notice to any of the insurance companies. Accordingly, we do not have to answer the question whether Greycoat was, in fact, covered under each of the policies and simply assume, *arguendo,* that Greycoat was covered by all three.[2]

## III.

■ Before turning to our analysis of the timeliness of Greycoat's notice to the insurance companies, we address Greycoat's argument that the law of Maryland, and not the District of Columbia, should apply to our disposition of that issue. Maryland law is more favorable to an insured on the issue of notice in that it requires that the insurer show actual prejudice before it may assert a defense of late notice. *See Scottsdale Insurance Co. v. American Empire Surplus Lines Insurance Co.,* 791 F.Supp. 1079, 1082 (D.Md.1992). We review choice of law questions *de novo. Hercules & Co., Ltd. v. Shama Restaurant Corp.,* 566 A.2d 31, 40 (D.C. 1989). Courts must apply the law of the forum with the more substantial interest in

2. The trial court granted summary judgment for Liberty Mutual, *concluding as a matter of law* that, despite the certificates of insurance naming Greycoat as an additional insured, Greycoat was not covered by Liberty Mutual's policy on May 12, 1988. Specifically, the court concluded that Liberty Mutual's coverage of "additional insurers," according to Liberty Mutual's policy, reached only those third parties who had entered written contracts with Schnabel, the primary insured. Although Greycoat and Schnabel had drafted a written contract with an indemnification clause, they did not execute it until June 28, 1988, after the work had already begun. Therefore, the court concluded that no underlying contract between Greycoat and Schnabel existed on May 12, 1988, and Greycoat was thus not covered by Schnabel's policy with Liberty Mutual.

While this court has never answered and does not answer in this case the question whether Liberty Mutual's issuance of the certificates of insurance precludes Liberty Mutual's claim that Greycoat did not qualify under the policy, the equities appear to weigh in favor of coverage. Liberty Mutual repeatedly acknowledged that Greycoat was an additional insured at the time of

the incident, not only in its correspondence to Greycoat after this suit was initiated, but more importantly when Liberty Mutual endorsed a certificate of insurance twice in advance of the occurrence: on March 30, 1988, and on April 21, 1988. *See Strain Poultry Farms v. American Southern Insurance Co.,* 128 Ga.App. 600, 197 S.E.2d 498, 500 (1973) (estopping an insurer from denying coverage to an added insured on a certificate who was not named in the policy).

Maryland Casualty is on firmer ground in alleging that Greycoat was not covered as an additional insured. Greycoat did not meet its burden in the trial court to show that the independent agent purporting to confirm Maryland Casualty's coverage for Greycoat was acting with either the actual or the apparent authority of Maryland Casualty. *See Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 612 A.2d 322, 334–35 (1992), *cert. granted,* 329 Md. 168, 617 A.2d 1085 (1993); *Waller v. Keene,* 26 Md.App. 367, 338 A.2d 355 (1974), *rev'd on other grounds,* 276 Md. 605, 349 A.2d 628 (1976). Nevertheless, we need not conclusively decide the coverage issue, where regardless of coverage, the notice question will dispose of the matter.

the litigation. *Eli Lilly & Co. v. Home Insurance Co.*, 764 F.2d 876, 882 (1985).

■ In this case, the District of Columbia has the greater interest in the outcome of the litigation. Although the fact that the incident occurred in the District of Columbia is significant, it is, as Greycoat notes, not enough to require application of District of Columbia law. *Lee v. Wheeler*, 830 F.2d 1181, 1181-82 (1987). Greycoat's contacts with the District, however, are much greater than that. Greycoat is a District of Columbia limited partnership. The underlying Greycoat construction contracts expressly state an intent to be governed by D.C. law. The underlying Akridge and Westory suits were brought in the District. In comparison, Maryland's interest in this litigation is not great. Although Metrex's insurance policies from Maryland Casualty were brokered and signed in Maryland, and although Metrex, not a party to this action, and Maryland Casualty are Maryland-based, PMA is based in Pennsylvania, and Liberty Mutual is based in Massachusetts. No other significant contacts with Maryland are alleged. Most persuasive on the choice of law question, Greycoat itself brought the suit in the District of Columbia Superior Court. Greycoat is hard-pressed now to claim that the District of Columbia courts should apply Maryland law, an argument raised for the first time in a motion to reconsider an unfavorable grant of summary judgment. Therefore, we apply District of Columbia law.[3]

### IV.

■ In the District of Columbia, where compliance with notice provisions is a contractual precondition to coverage, a failure timely to notify releases the insurer from liability. *Diamond Service Co. v. Utica Mutual Insurance Co.*, 476 A.2d 648, 652–54 (D.C.1984); *Greenway v. Selected Risks Insurance Co.*, 307 A.2d 753, 755–56 (D.C.1973). Notice provisions in insurance contracts are

of the essence of the contract. *Diamond Service*, 476 A.2d at 652. PMA's policy, a copy of which Greycoat, at its peril, failed to request prior to the instant litigation, required that an insured seeking coverage give notice of an underlying occurrence "as soon as practicable." The policy also required that if a suit is filed against an insured, that insured must notify PMA "immediately" and provide PMA with all relevant papers served in the lawsuit. Similarly, the Liberty Mutual policy required that it be notified "promptly" of the underlying occurrence and of any suits, and be provided "immediately" with any legal papers or summonses. Maryland Casualty's policy placed obligations upon an insured identical to those in the Liberty Mutual policy.

■ This court has held that insurance policies with such notice provisions require notice "within a reasonable time in view of all the facts and circumstances of each particular case." *Greenway*, 307 A.2d at 755. Reasonableness will often be a question for the jury, but where, as here, the evidence as to timing is uncontradicted, reasonableness of the delay may become a question of law. *Starks v. North East Insurance Co.*, 408 A.2d 980, 982–83 (D.C.1979). The "question whether an insured has acted reasonably becomes a question of law ... when reasonable persons can draw but one inference and that inference points 'unerringly' to the conclusion that the insured has not acted reasonably under the circumstances." *Id.* at 982 (quoting *Oregon Automobile Insurance Co. v. Fitzwater*, 271 Or. 249, 259, 531 P.2d 894 (1975) (en banc)).

■ Here it is uncontradicted that Greycoat's notice of the underlying incident as well as of the need for a defense was given well after the occurrence of significant events. Greycoat notified two of the three insurance companies of the Akridge and Westory suits in late December 1990, over

---

**3.** Greycoat alternatively argues that this jurisdiction should adopt a rule similar to that in Maryland, requiring a showing of prejudice to the insurer in order for a late-notice defense to prevail. This jurisdiction has explicitly rejected such a legal requirement in prior cases. *Greenway v. Selected Risks Insurance Co.*, 307 A.2d 753, 756 (D.C.1973). This division does not have the authority to overturn prior holdings, even if it could find support in this record for the unlikely proposition that no prejudice to the insurers has occurred here. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

two and a half years after the tank was pierced, almost a year after Greycoat first retained construction litigation counsel, seven months after it first met with the Akridge plaintiffs about the impending litigation, five months after the Akridge suit was filed, and two months after the Westory suit was filed. The third insurer, Maryland Casualty, was not notified of the need for a defense until the following March, 1991.

This court has identified some of the factors that determine whether delay in notice was reasonable: (1) what the insured could have believed were its obligations under the policy, (2) what the insured could have believed about its likely liability in the underlying action, and (3) what the insured could have believed was the likelihood of being sued. *Diamond Service*, 476 A.2d at 653. First, Greycoat knew, or should have known, that it was required by the plain terms of the insurance policies to provide timely notice to each insurer of a claim for damages. Second, as the original target of the Akridge and Westory lawsuits, Greycoat knew that it was as likely as any of its contractors to be assigned some liability—hence its early retention of well-known litigation counsel. Finally, Greycoat also knew, at least from July 1990, that it was actually being sued. For reasons that follow, Greycoat's failure to notify under these circumstances absolves each insurer from any obligations it had to Greycoat.

In this case, we rely on the filing of the Akridge complaint in July 1990 as the event triggering the notice requirement. Greycoat, giving notice more than five months later, simply waited unreasonably long from that date. It has never proffered an explanation why.[4] By delaying notice for five months to Liberty Mutual and PMA, and eight months to Maryland Casualty, Greycoat deprived the insurance companies of the opportunity to plan and implement an appropriate litigation strategy. Liberty Mutual alerts this court that prior to providing notice to any of the insurers and requesting a defense, Greycoat engaged in settlement discussions, answered both the Akridge and Westory complaints, filed counterclaims against the plaintiffs in the Akridge case, requested discovery in Akridge, filed third-party claims against Metrex and Schnabel in both cases, moved to consolidate the two suits, responded to Akridge discovery requests, responded to Schnabel's interrogatories, and posed interrogatories of its own to all four other parties to the two actions. Thus, this is not even among those closer cases where the "insured knows that it is involved in an accident but decides that it is not liable." *Starks*, 408 A.2d at 985 n. 9. Greycoat knew liability was on the horizon and chose not to act for a period of time that was unreasonable as a matter of law. *Id.*

## V.

◼ Finally, Greycoat takes the position that it is owed a defense by all three companies because an insurer typically has a duty to defend if the allegations in the underlying complaint potentially bring the claim within the policy's coverage. *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282, 285–87 (App.1982). That argument would apply if the question to be resolved were whether the nature of the damage fell within the policies' various exclusions, such as the pollutant exclusions contained in all three policies. Here, the late-notice issue is dispositive. Greycoat is not covered no matter what the harm was to the plaintiffs in the underlying suit, and regardless of whether Greycoat turns out to be

---

4. If the event triggering the notice requirement were the piercing of the oil tank, Greycoat would certainly have difficulty explaining how a delay of two to three years qualifies as notice provided "promptly" or "as soon as practicable." According to this court in *Diamond Service*, a duty to report arises following a "reportable occurrence." A "reportable occurrence is an incident 'sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages.'" 476 A.2d at 653 (quoting *Starks*, 408 A.2d at 983). The piercing of an underground oil storage tank in an occupied downtown area likely meets the test of a "reportable occurrence." Nevertheless, because of the early efforts undertaken by Greycoat to isolate the oil leak, and Greycoat's apparent ignorance of the true extent of the damage, we focus on the filing of the lawsuits to time the lateness of Greycoat's notice to the insurers.

liable in a manner that would have been contemplated by the policy if Greycoat had not waived its indemnity. Because there is an independent ground for concluding that Greycoat waived its claims to coverage and to a defense from the insurers, we conclude as a matter of law that Greycoat cannot prevail on its claim that the insurers should defend it pending further determination of its liability in the underlying suits.

Accordingly, the grant of summary judgment is affirmed.

*So ordered.*