**WASHINGTON SPORTS AND
ENTERTAINMENT, INC.,
et al., Plaintiffs,**

v.

**UNITED COASTAL INSURANCE
CO., Defendant.**

**No. CIV. 97–400 TFH.**

United States District Court,
District of Columbia.

Feb. 26, 1998.

**3**

John Jude O'Dowell, Randel, Hunt Norton, J. Michael Hannon, Washington, DC, for Defendant.

Arent Fox Kitnier Plutnik & Kahn, Washington, DC, for Plaintiffs.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court are plaintiffs' motion for partial summary judgment and defendant's motion to dismiss the Complaint. The Court held a hearing on these motions on January 29, 1998. After consideration of the submissions of the parties, and of the arguments made at the hearing, the Court will grant plaintiffs' motion for partial summary judgment and will deny defendant's motion to dismiss.

### I Factual Background

This suit arises out of plaintiffs' attempt to enforce an insurance contract issued by defendant. Plaintiffs are the owners and operators of the new MCI Center, in downtown Washington, D.C., and they are named as additional insureds on an insurance policy written by defendant. In 1996, the Paralyzed Veterans of America (PVA) successfully sued plaintiffs, along with other parties, on the grounds that design for the MCI Center failed to comply with the requirements of the Americans With Disabilities Act (ADA).[1]

---

1. At the summary judgment stage in the PVA litigation, the Court held that the ADA requires an arena to provide enhanced seating to wheelchair patrons, so that they can see over standing spectators. *Paralyzed Veterans of America v. Ellerbe Becket,* 950 F.Supp. 389 (D.D.C.1996). The Court also held that such seating must be dispersed throughout the arena, and that it must be reasonably integrated into the overall seating arrangement. *Id.* After a trial on the merits, the Court held that the MCI Center, as designed at that time, did not comply with the ADA's requirements of enhanced sightlines or adequate dispersal. *Paralyzed Veterans of America v. Ellerbe Becket,* 950 F.Supp. 393 (D.D.C.1996). The D.C. Circuit affirmed the Court's opinions in their

The insurance policy in question contains clauses that obligate defendant both to defend and to indemnify its insureds. Defendant refused to defend plaintiffs against the PVA claim.

### A. Parties

The plaintiffs, Washington Sports and Entertainment Inc. (WSEI), as itself and as the sole general partner of the D.C. Arena, L.P., (DCALP) are a Washington, D.C. corporation, with its principal place of business in Maryland and the District of Columbia. Plaintiffs in this case were defendants in *Paralyzed Veterans v. Ellerbe Becket, et al.,* C.A. 96–1354.

The defendant, United Coastal Insurance Co. ("United Coastal") is an Arizona corporation with its principal place of business in Connecticut. United Coastal insured plaintiffs as additional insureds for liability arising from the professional negligence of the named insured, Ellerbe Becket, which was the architect of the MCI Center. United Coastal did not defend plaintiffs in the PVA suit nor did it reimburse them for any litigation expenses incurred.

Although not a party to the present suit, Ellerbe Becket Architects & Engineers, P.C., was the primary architect on the MCI Center design/build team. It was a defendant in the *Paralyzed Veterans* suit; however, the Court dismissed Ellerbe Becket on July 29, 1996. *Paralyzed Veterans of America v. Ellerbe Becket,* 945 F.Supp. 1 (D.D.C.1996). Ellerbe Becket is also the primary insured on the contract in question in this case.

### B. The Insurance Policy

In July of 1995, plaintiffs entered into a contract, the "Design–Build Agreement," with Ellerbe Becket to design and build the MCI Center. In late 1995, Ellerbe and plaintiffs looked for professional liability insurance to protect the project. Defendant issued Ellerbe Becket a professional liability insurance policy with a limit of $5 million. The contract was dated November 20, 1995,

although it was retroactively effective to October 20, 1995. While Ellerbe and its design team were the named insureds, the policy also included additional insureds, among them plaintiffs. Plaintiff D.C. Arena paid the full premium for the contract—over $500,000—up front.

The Policy states that United Coastal has a duty to defend any claim against the insured seeking loss on account of named risks. However, it has "no duty to defend or indemnify against any claim seeking damages which are excluded from coverage under the terms of this policy. Any claim that would be excluded from coverage if brought directly against any Insured is excluded as to all Insureds regardless of the insured or other party against whom the claim is brought." Policy at p. 1 § a.

The parties amended the Policy to include plaintiffs as additional insureds, but "only for liability arising from the professional services performed by and [sic] Named Insureds on this policy and only for claims by persons or entities not insured on this policy." *Id.* at Special Additional Insured Endorsement, Endorsements [2], p. 9.

The Policy defines "claim" as "a written demand for money or services first made against the Insured and reported in writing to the Company." *Id.* at 7, ¶ 1. The type of "loss" covered by the Policy is defined to mean "the total sum which the Insured becomes legally obligated to pay as damages by reason of named risks." *Id.* at 7, ¶ 5. The Policy expressly defines "damages" to mean "compensatory damages only." *Id.* at 7, ¶ 3. "Damages" do not include "fines, assessments, punitive damages, damages distribution, multiplied damages, bad faith damages, penalties, the return or withdrawal of fees, or the value of any services the Insured is required or agrees to perform." *Id.* However, the Policy also defines "loss" to include "all sums paid as salaries, wages, compensation, fees…expenses for doctors, lawyers, nurses, investigators and other persons, and for litigation, settlement, adjustment, and investiga-

entirety. *Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579 (D.C.Cir.1997).

**2.** The main body of the contract is essentially a form contract, and the endorsements are specially dickered terms.

tion of claims and suits which are paid by the Company or by the Insured, with the consent of the company." *Id.*

The Policy defines "named risks" to include "the Insured's negligence, error or mistake in rendering or failing to render professional services alleged to arise or actually arising out of those services specified in item 5 of the Declarations." *Id.* at 7, ¶ 6. Item 5 describes "professional services" as "[a]ll design work and professional services performed by named insureds associated with the MCI Center in Washington, D.C. and as described in the Design/Build Agreement between D.C. Arena, L.P. and D.C. Arena Associates, Inc. dated July 31, 1995." *Id.* at Declaration Page.

In addition to provisions in the main body of the contract, there are several key exclusions, amendments, and endorsements that are relevant to this dispute. Exclusion 39 provides that the policy does *not* apply to "[a]ny and all claims both from victims and governmental agencies arising out of or relating to discrimination of any kind including sexual discrimination, sexual harassment, violation of the Americans with Disabilities Act or violation of any other civil rights." *Id.* at 5 ¶ 39. However, that exclusion is expressly modified by an endorsement (called by the parties "endorsement 5"), which adds the following provision: "However, this exclusion shall not apply to a design error that could result in a violation of the Americans with Disabilities Act." *Id.* at Endorsements, p. 6, ¶ 9.

At Exclusion 38, the Policy disclaims coverage for "any claim, expense, penalty, fine, assessment, tax, *actions for injunction,* or any suits arising out of or relating to CERCLA, RCRA, Clean Air Act, or any other Federal, State, or local statute." *Id.* at 5, ¶ 38 (emphasis added). However, the endorsements modify the exclusion to provide coverage if "such claim . . . or actions for injunctions or suit could be asserted against the Insured in the absence of regulations promulgated in CERCLA or RCRA." *Id.* at Endorsements, p. 6, ¶ 8.

Finally, Exclusion 45 states that the policy shall not apply to "any loss or damages or named risks known to any Insured at the effective date of this Policy." *Id.* at 6, ¶ 45.

In the event of a claim, the insured is obligated, as a condition precedent to coverage, to give the insurer "[w]ritten notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place, and circumstances of the event complained of . . . to the Company or any of its authorized representatives." *Id.* at 8, ¶ 3; Policy at Endorsement 8, ¶ 1. The Policy requires that notice "shall be given immediately (but not later than 60 days)." *Id.* In addition, the Policy provides that the insured "shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident, without our consent." Policy at 8, ¶ 3(c).

### C. Design–Build Agreement

The Design/Build Agreement is the contract between plaintiffs and Ellerbe Becket. It sets forth the scope of work and responsibilities between the parties; the insurance Policy defines coverage according to design work performed pursuant to this agreement.

The Design/Build Agreement defines "design work" as "that portion of the Work consisting of the design services required to be provided in connection with the design of the Project as set forth in the Contract Documents, and subcontracted by the Design/Builder to the Architect, which shall be performed consistent with the standards of professional care exercised by national design firms." Design/Build at 4, § 1.28.

The Agreement originally provided that "Design Development documents shall accommodate the disabled in accordance with the Owner's interpretation of Title II of the ADA." However, the parties modified that provision in a December 1995 amendment, which provided that the "Design Development documents shall accommodate the disabled in accordance with the requirement of the ADA. The Design/Builder has incorporated the Owner's interpretations of the ADA solely with respect to Luxury Suite bathrooms and the sightlines for wheel chair patrons in the seating bowl and the Owner shall

be responsible for those interpretations." Amendment at 11–12.

### D. The PVA Litigation

The PVA plaintiffs filed their suit on June 14, 1996; they filed an Amended Complaint on July 31, 1996. The Amended Complaint alleged that the MCI Center "as designed to be constructed, denies persons who use wheelchairs full and equal access to the sporting and cultural events to be held at the facility." PVA Amended Complaint at 3. Specifically, it alleged:

a) that the proposed design fails to provide enhanced lines of sight at wheelchair locations, in violation of the ADA;

b) that the proposed design "fails to provide the required number of wheelchair locations, in violation of the ADA;" and

c) that the proposed design fails to provide wheelchair patrons with adequate dispersal, such that the patrons are offered choice of admission prices and lines of sight.

PVA Amended Complaint at ¶¶ 33, 39, 46. The Amended Complaint sought a declaratory judgment, an injunction to require design and construction in accordance with the ADA, costs and attorneys' fees, and "such other and further relief as the Court shall deem proper." *Id.* at 34–35.

On December 20, 1996, the Court issued a Memorandum Opinion that formed the basis for judgment in the PVA plaintiffs' favor. *Paralyzed Veterans of America v. Ellerbe Becket*, 950 F.Supp. 393 (D.D.C.1996). In that Opinion, the Court held that the design failed to comply with the ADA's requirements of enhanced sightlines and adequate dispersal. *Id.* at 402–405. However, the Court found that the *Paralyzed Veterans* defendants had acted in "good faith," and found that the problem of interpretation lay primarily with the Justice Department. *Id.* at 394. In a separate Order, the Court enjoined the arena parties to redesign the MCI Center in compliance with the ADA, as interpreted in the Opinion. That Order specifically required that the building be redesigned to include a sufficient number of wheelchair locations that have enhanced lines

of sight, and that these spaces be sufficiently dispersed throughout the seating bowls.

### E. Defendant United Coastal's Actions

The PVA plaintiffs filed their original complaint on June 14, 1996. It is undisputed that DCALP sent "written notice" to Johnson & Higgins, the insurance broker from whom Ellerbe Becket had obtained the policy. J & H sent a notifying letter to defendant United Coastal; defendant acknowledges receipt of that letter by August 13, 1996. Plaintiffs contend that they provided United Coastal with "a large amount of documentary information," including the pleadings and documents from the PVA litigation.

Defendant United Coastal refused to defend plaintiffs in the PVA litigation. In letters dated December 3, 1996, December 19, 1996, and January 6, 1997, it stated that the litigation was outside the coverage of the policy. The first two letters raised only coverage defenses; not until the January 6, 1997, letter does defendant raise failure to provide notice as a defense.

Plaintiffs made a final demand for defense and coverage by letter on February 5, 1997. Defendant rejected that demand on February 18, 1997. That latter rejection expanded defendant's assertion of defenses, and it for the first time provided a detailed defense based on notice.

### F. The Present Litigation

Plaintiffs filed their Complaint in this case on February 26, 1997. The Complaint seeks a declaratory judgment that defendant had a duty to defend them in the lawsuit (Count One), a declaratory judgment that defendant had a duty to indemnify them for losses (Count Two), and alleges that defendant has breached the contract (Count Three), that defendant acted in bad faith (Count Four), and that defendant has breached a fiduciary duty (Count Five). The Complaint seeks, in addition to the declaratory judgments, a permanent injunction, compensatory and punitive damages, and fees and costs.

Defendant has moved to dismiss the complaint, or, in the alternative, for complete summary judgment. Plaintiffs have moved

for partial summary judgment on Counts One and Three.

## II Legal Standard and Present Motions

Defendant has moved for dismissal, and plaintiffs for summary judgment on Counts One and Three of the Complaint. Dismissal of the Complaint is appropriate "only if 'it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations.'" *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Martin v. Ezeagu*, 816 F.Supp. 20, 23 (D.D.C.1993). In evaluating a motion to dismiss, the Court must construe the complaint in the light most favorable to plaintiff and give plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979).

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a genuine issue of fact only if there is such evidence that a reasonable jury could return a verdict for the non-moving party; a fact is material only if it might affect the outcome of the suit under applicable law. *Id.* at 248, 106 S.Ct. 2505.

## III Discussion

█ Plaintiffs seek a judgment based on defendant's duty to defend them against claims. Under District of Columbia law, the duty of an insurer to defend is broader than its duty to indemnify. The insurer must defend an entire claim if it appears that at least one count of a complaint falls within the scope of policy coverage, even though the insurer might later be absolved of a duty to indemnify on certain counts. *Continental Casualty Co. v. Cole*, 809 F.2d 891, 895 (D.C.Cir.1987); *Beltway Management Co. v. Lexington–Landmark Ins. Co.*, 746 F.Supp. 1145, 1149 (D.D.C.1990); *Washington Occupational Health Associates, Inc. v. Twin City Fire Insurance Co.*, 670 F.Supp. 12, 16 (D.D.C.1987); *American Continental Ins. Co. v. Pooya*, 666 A.2d 1193, 1197 (D.C.1995).

█ The Court interprets insurance contracts under a "reasonable person" standard; thus, terms have their common meaning unless a technical meaning is specified. *Potomac Electric Power Co. v. California Union Ins. Co.*, 777 F.Supp. 968, 974 (D.D.C. 1991); *Oler v. Liberty Mutual Ins. Co.*, 297 A.2d 333, 335 (D.C.1972). In addition, any provisions that exclude coverage must be explicit. *Nationwide Mutual Ins. Co. v. Schilansky*, 176 A.2d 786, 788 (D.C.1961). Furthermore, the insurer generally bears the burden of establishing that an exclusion bars coverage. *See Carey Canada, Inc. v. California Union Ins. Co.*, 748 F.Supp. 8, 15 (D.D.C.1990) (Court applying Florida insurance law). Finally, under D.C. law, the Court resolves true ambiguities in favor of the insured, in order to give effect to a policy's dominant purpose of indemnity. *Harbor Ins. Co. v. Omni Construction, Inc.*, 912 F.2d 1520, 1522 (D.C.Cir.1990); *American Red Cross v. Travelers Indemnity Co.*, 816 F.Supp. 755, 758 (D.D.C.1993) (Harris, J.).

Plaintiffs argue that United Coastal was required to defend the PVA lawsuit under the terms of the insurance Policy. Defendant responds, first, by asserting that the PVA suit was not covered under the contract. Defendant presents two arguments in favor of this defense. First, defendant argues that the Policy covers only claims for "damages," and that PVA's Complaint sought only other relief. Second, defendant asserts that the subject matter of the PVA suit was outside the Policy's coverage.

In addition, defendant asserts several technical defenses to plaintiffs' claim for coverage. First, United Coastal argues that, when they negotiated the insurance contract, plaintiffs already knew that the MCI Center would not comply with the ADA. Second, defendant asserts that plaintiffs have forfeited coverage, both by failing to provide adequate, timely notice of the PVA claim and also by retaining expensive counsel without permission.

The Court finds defendant's arguments unpersuasive. The language of the Policy indicates that plaintiffs do enjoy coverage for this type of ADA liability, and that the PVA claim is not excluded under the contract. Furthermore, there is no evidence from which a reasonable jury could find that plaintiffs knew that there would be a claim when they sought coverage, nor is there evidence that plaintiffs misrepresented the risks. Finally, the evidence demonstrates that plaintiffs gave timely notice, that defendant waived its right to deny coverage based on notice, and that plaintiffs did not forfeit their coverage by retaining counsel. Therefore, the Court finds that defendant had a duty to defend the PVA claim, and that defendant breached that duty.

### A. The Policy Covered PVA's Claims Against Plaintiffs

The insurance contract provides coverage for Ellerbe Becket's "negligence, error or mistake in rendering or failing to render professional services." By Special Endorsement, the policy adds plaintiffs as additional insureds, but it extends coverage "only for liability arising from the professional services performed by [Ellerbe Becket or another named insured] on this policy." PVA sued plaintiffs primarily for injunctive relief, and the gravamen of PVA's claims was that the MCI Center design violated the ADA.

It does not matter than some of PVA's claims may have fallen outside the Policy's coverage. If even one claim in the Amended Complaint might have triggered coverage, then defendant was obligated to provide defense. See Continental Casualty Co. v. Cole, 809 F.2d 891, 895 (D.C.Cir.1987); Beltway Management Co. v. Lexington–Landmark Ins. Co., 746 F.Supp. 1145, 1149 (D.D.C. 1990); Washington Occupational Health Associates, Inc. v. Twin City Fire Insurance Co., 670 F.Supp. 12, 16 (D.D.C.1987); American Continental Ins. Co. v. Pooya, 666 A.2d 1193, 1197 (D.C.1995).

Defendant argues that the suit was entirely outside the scope of coverage. First, it argues that the Policy provides coverage solely for claims that seek "compensatory damages," and that the PVA claim did not seek these damages. Second, it argues that PVA's suit was based on actions undertaken solely by plaintiffs, and not by Ellerbe Becket. Therefore, argues defendant, the Policy does not provide coverage for the PVA suit against plaintiffs, who enjoy only limited coverage, as additional insureds.

### 1. Policy Coverage of PVA Relief

■ The Policy provides coverage only against a "claim," which it defines as "a written demand for money or services." Policy at ¶ 1. More specifically, Policy provides coverage for "the total sum which the Insured becomes legally obligated to pay as damages." Id. at ¶ 5. In defining the extent of coverage, the Policy expressly limits "damages" to "compensatory damages only." Policy at ¶ 3. Damages do not include "fines, assessments, punitive damages, damages distribution, multiplied damages, bad faith damages, penalties, the return or withdrawal of fees, or the value of any services the Insured is required or agrees to perform." Id. However, the definition of "loss" suggests coverage for "sums paid as salaries, wages, compensation, [and] fees [for lawyers as part of litigation]." Id. at ¶ 5. Defendant argues that the PVA claim did not seek any relief that is covered under the Policy, and therefore that it had no duty to defend plaintiffs against the suit.

The PVA suit sought declaratory and injunctive relief, attorneys' fees, and "other and further relief," as the court found appropriate. It did not specifically seek compensatory damages; indeed, the ADA does not create a civil cause of action for damages. Even after losing the case, the arena defendants did not pay any money to the PVA plaintiffs; they expended money only for attorneys fees and costs, and for the costs of complying with the Court's injunction.

■ The PVA claim did not seek compensatory damages in the traditional sense. The costs of compliance with an injunction are clearly excluded from coverage by the contract's definitions. However, PVA did seek whatever "other and further relief" that the Court deemed proper. Such a demand can be seen as a demand for compensatory dam-

ages, for purposes of triggering insurance coverage. *See Energex Systems Corp. v. Fireman's Fund Ins. Co.*, 1997 WL 358007 at *5, 1997 LEXIS 8894 at *14 (S.D.N.Y. June 25, 1997) (Applying N.Y. insurance law, citing *Doyle v. Allstate*, 1 N.Y.2d 439, 154 N.Y.S.2d 10, 136 N.E.2d 484 (N.Y.1956)). The Court agrees that PVA demanded any compensatory damages to which they might be entitled. Therefore, since part of the PVA Complaint sought these compensatory damages, defendant was obligated to defend all claims.

 In addition, the Policy covers certain claims for injunctive relief, at least for a suit brought under the ADA. While the Policy contains a general, boilerplate exclusion of coverage for demands of punitive damages and of injunctive relief, Policy at 5, ¶ 38, the parties negotiated an endorsement that negated the exclusion in most cases.[3] Policy at Endorsement 5, ¶ 8. More importantly, the Policy clearly states that the coverage exclusion does not apply to suits based on a design error that violates the ADA. Policy at Endorsement 5, ¶ 9. Since claimants under the ADA can only seek injunctive relief, this Endorsement must extend coverage to such injunctive suits. Any other construction would read the endorsement into oblivion.[4]

Finally, the Court must construe ambiguities in favor of the insured, unless an ambiguous interpretation is clearly without merit. *Red Cross*, 816 F.Supp. at 758. Plaintiffs have demonstrated that PVA's demand of "other relief" may be construed as a demand for whatever compensatory damages might

3. The exclusion remains in effect for suits brought pursuant to CERCLA or RCRA.

4. Defendant attempts to explain the endorsements by asserting that the ADA clause was meant only to cover a mechanical design error (e.g. miscalculation of slope), not a policy decision to provide certain types of seating. The Court notes, first, that this explanation undercuts defendant's primary argument that the Policy does not cover injunctive actions at all, since even a claim based on a mechanical violation of the ADA could seek only injunctive relief. More importantly, however, defendant's interpretation of this language is by no means obvious. For this reason, it is insufficient to negate defendant's general duty to defend claims that might trigger policy coverage.

5. In addition, the PVA demand for attorneys fees may be a demand for damages. This Circuit has

apply.[5] Furthermore, the Policy appears to cover claims under the ADA, even though they primarily seek injunctive relief. Thus, the PVA Amended Complaint demanded relief that falls within the Policy's coverage, and defendant has a duty to defend against these demands.

*2. Policy Coverage of Plaintiffs' Actions*

 Defendant next argues that the PVA litigation hinged solely on design decisions made by plaintiffs, and not by Ellerbe Becket. The Policy only extends coverage for "design work and professional services performed *by named insureds* [Ellerbe Becket] associated with the MCI Center in Washington, D.C. and as described in the Design/Build Agreement between D.C. Arena, L.P. and D.C. Arena Associates, Inc. dated July 31, 1995." Policy at 1 (emphasis added). The Policy expressly limits plaintiffs' coverage as additional insureds to "liability arising from the professional services performed by [Ellerbe Beckett] on this policy." *Id.* at Special Additional Insured Endorsement, Endorsements, p. 9.

The plain meaning of these provisions is that the Policy does not provide coverage for mistakes made by plaintiffs themselves. Plaintiffs argue that coverage of additional insureds is not limited to vicarious liability coverage, unless the policy explicitly provides for that. *See e.g., Philadelphia Electric Co. v. Nationwide Mutual Ins. Co.*, 721 F.Supp. 740, 742 (E.D.Pa.1989); *Travelers Indemnity*

stated that the normal meaning of the word "damages" encompasses all financial liabilities one is obligated to pay as a result of another's loss. *Independent Petrochemical Corp. v. Aetna Casualty and Surety Co.*, 944 F.2d 940, 945 (D.C.Cir.1991). Under that definition, it would seem that attorneys' fees could be considered damages. Furthermore, the Policy defines "loss" to include lawyers' "salaries, wages, compensation, fees, charges, and costs," and to include costs for litigation of claims. Policy at 7, ¶ 5. Because the Court finds that PVA's demands for an injunction under the ADA and for "other relief" trigger coverage under the Policy, it need not determine whether the language in ¶ 5 covers third party legal fees. However, plaintiffs have made a strong case for coverage on that basis as well.

*Co. v. Hanover Ins. Co.,* 470 F.Supp. 630, 632–33 (E.D.Va.1979). However, the Policy at issue in this case explicitly limits plaintiffs' coverage to liability arising out of the services of Ellerbe Becket. For this reason, the Court finds that the Policy limits coverage to vicarious liability, and that it does not extend coverage to acts or omissions made solely by plaintiffs, because those acts and omissions do not implicate the "professional services" of Ellerbe Becket.

 The key issue, then, is whether any claims in the PVA litigation triggered plaintiffs' vicarious liability for Ellerbe Becket's actions, as opposed to plaintiff's direct liability for their own acts and omissions. Under normal circumstances, the architect is liable for design decisions, including those regarding ADA compliance. However, the Design/Build Agreement shifted at least some responsibility for ADA decisions over to plaintiffs, thereby making their liability for these decisions direct, not vicarious. Defendant argues that plaintiffs assumed liability for all ADA decisions, thereby negating coverage.

In the original Design/Build Agreement, plaintiffs had taken responsibility for all ADA interpretations, stating that the "Design Development documents shall accommodate the disabled in accordance with the Owner's interpretation of Title II of the ADA." However, the design process subsequently changed, and Ellerbe Becket assumed responsibility for all ADA design decisions, except that they "incorporated the Owner's interpretations of the ADA solely with respect to Luxury Suite bathrooms and the sightlines for wheel chair patrons in the seating bowl and the Owner shall be responsible for · those interpretations." December 1995 Amendment at 11–12. Therefore, at most, the amended Design/Build Agreement gives plaintiffs responsibility for the design of the suites and for the sightlines from wheelchair spaces. The Agreement, as amended in December 1995, clearly leaves the responsibility for other design decisions—such as meeting ADA standards on integration and dispersal of seating—with Ellerbe Becket.[6]

While plaintiffs may not have coverage for certain claims based on the sightlines or the suite design, they do have coverage for claims based on other design errors. PVA's suit focused largely on the sightlines issue, but the dispersal and integration issues formed the basis for important, additional claims. Therefore, while some of PVA's claims against the arena entities may have been outside the scope of coverage, some clearly were within the scope of coverage. Although defendant·may eventually escape a duty to indemnify plaintiff on certain claims, it had a duty to defend all the claims.

## B. There are No Technical Defenses to Plaintiffs' Claim

Defendant argues that, even if the PVA claims are covered under the terms of the Policy, plaintiffs' behavior has waived or negated coverage. Specifically, defendant asserts that plaintiffs knew of the ADA violations and/or misrepresented the risks at contract· formation, that plaintiffs failed to give adequate notice of the PVA claim, and that plaintiffs waived the right to defense when they retained their own counsel.

## A. Plaintiffs' Knowledge of Risk

 An insurance policy is generally voidable where a party has made a misrepresentation that would materially affect the insurer's decision to take on a certain risk. *Jones v. Prudential Ins. Co.,* 388 A.2d 476, 480 (D.C.1978); *Metropolitan Police Retiring Association v. Tobriner,* 306 F.2d 775,

---

**6.** Defendant urges the Court to ignore the December amendments to the Design/Build Agreement. Defendant argues that it wrote the policy based on the belief that ADA liability would be outside the scope of coverage, as suggested in the original Agreement, and that it did not account for the additional liability imposed by the amended Agreement. The Court is not persuaded by this argument, since there is no evidence that the parties intended to so limit coverage, or to preclude alterations in the Agreement. To the contrary, the Policy clearly contemplates . coverage for claims arising from ADA design decisions. *See* Endorsement 5, ¶9. If plaintiffs were responsible for all ADA design liability, then there would be no coverage for ADA errors, and Endorsement 5 would have little effect, if any at all. The Court is not willing to consign Endorsement 5 to legal purgatory; therefore, it cannot accept defendant's argument.

777 (D.C.Cir.1962). In addition, Exclusion 45 of the Policy explicitly voids coverage for "any loss or damages or named risks known to any Insured at the effective date of this Policy." *Id.* at 6, ¶ 45. Defendant claims that these principles, bolstered by the explicit provision found at Exclusion 45, bar coverage for the PVA suit.

■ Defendant first asserts that plaintiffs knew that the MCI Center design did not comply with the ADA. In support of this contention, defendant presents several letters—from PVA and the Justice Department, among others—addressed to plaintiffs, that predate the application for insurance. These letters stated a belief that the MCI Center design failed to comply with the sightlines, integration, and dispersal requirements of the ADA. Defendant contends that, on the basis of these letters, plaintiffs knew that the design did not comply with ADA standards, that litigation was approaching, and that a claim under the policy was inevitable.

This Court has already found, however, that plaintiffs did not know in 1995 the MCI Center design failed to comply with the ADA. Indeed, the Court found in its December 20, 1996, Memorandum Opinion, that the arena entities had acted in the good faith belief that their design complied with the ADA. *Paralyzed Veterans of America v. Ellerbe Becket,* 950 F.Supp. at 394 (D.D.C. 1996). The arena entities submitted substantial evidence at that trial to support this belief, and the Court found that the design problems occurred primarily because the Justice Department had failed to clear up the uncertainties surrounding ADA standards. Therefore, while the arena entities—plaintiffs in the present case—may have appreciated some risk of suit, there is no evidence that they knew such a suit was imminent, much less meritorious.

■ Defendant next argues that plaintiffs made a material misrepresentation on their application for coverage. The application contained the question, "Do the principals of the firm have knowledge of any error, omis-

sion, or any other circumstance that is, or could be, a basis for a claim under the proposed policy?" Ellerbe Becket, which filled out the application, answered, "No."

Although this statement may appear troubling under the floodlamp of hindsight, the Court finds that it was not a material misrepresentation at the time. There is no evidence that plaintiffs knew, in November 1995, that they would be sued, or that the arena ran afoul of the ADA.[7] The evidence demonstrates that plaintiffs were engaged in very preliminary discussions with the Justice Department and with PVA, and that plaintiffs had a good faith belief that the issue would be resolved well short of litigation, especially since there had never before been a suit that litigated this interpretation of the ADA. Therefore, plaintiffs had a reasonable, good faith belief in 1995 that they would not make a claim under the Policy for ADA litigation.

Plaintiffs may have feared a potential suit, but this concern alone does not convert Ellerbe Becket's statement into a material misrepresentation. Plaintiffs and Ellerbe Becket were obviously wary of a host of circumstances that *could* be a basis for a claim under the policy, with ADA issues perhaps among them. Indeed, no one buys insurance unless he is concerned about risks; plaintiffs must have had some concerns, or they would not have paid $500,000 for their insurance. However, there is no evidence that plaintiffs had any knowledge that one of these manifold risks was on the verge of occurrence.

Plaintiffs paid a substantial premium to shift risks to defendant, and defendant willingly agreed to accept those risks. Without showing that plaintiffs' motives stepped beyond a general risk aversion, defendant cannot evade its duty to honor the Policy and to defend plaintiffs, when one of those risks happened to materialize.

### B. Notice

■ Defendant also argues that plaintiffs failed to give notice of the PVA claim, as

---

7. In addition, plaintiffs did not fill out the application; Ellerbe Becket did. Thus, even if plaintiffs had some knowledge, Ellerbe Becket may not have. However, because the Court finds that the representation was not misleading, it need not reach the issue of plaintiffs' liability for Ellerbe Becket's statements.

required under the Policy. Policy notice provisions are conditions precedent to coverage, and failure to meet them can negate coverage. *Greycoat Hanover F Street Limited Partnership v. Liberty Mutual Ins. Co.*, 657 A.2d 764, 768 (D.C.1995). Failure to notify can be dispositive, and the insurer need not demonstrate prejudice. *Id.* Furthermore, courts interpret a requirement of immediate notice to require notice within a reasonable period of time. *Id.*

The Policy requires that an insured provide written notice of any claim for which it might seek coverage. Specifically, the contract requires that:

> "Written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place, and circumstances of the event complained of, and the names and addresses of the insured and of available witnesses, shall be immediately give (but not later than 60 days) by or for the Insured to the Company or any of its authorized representatives. It is a condition precedent that the Company receive written notice within 60 days.
>
> The Insured shall immediately (but not later than 60 days) forward to the Company every demand, notice, summons, or other process received by him or his representative. Notice of an incident, event or act, error or omission is not notice of a claim. Notice of an incident, event or act, error or omission to any Insured shall not constitute notice to the Company."

Policy at 8 ¶ 3 and at Endorsement 8, ¶ 1.

PVA filed suit on June 14, 1996. Ellerbe Becket sent a notice of claim—which allegedly contained copies of all suit papers—to Johnson & Higgins, on July 14, 1996. Although defendant disputes that Johnson & Higgins, which brokered the Policy, is an authorized representative, defendant admits in its pleadings that it received a letter from Johnson & Higgins on August 13. This letter, which informed defendant of the PVA suit, constituted actual notice.

■ At common law, if an insurer wrongly denies its duty to defend, on the grounds that a claim is outside the scope of a policy, it

waives the right to assert lack of notice as a defense. *See e.g., St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 724 F.Supp. 1173, 1180 (M.D.N.C.1989); *aff'd*, 919 F.2d 235 (4th Cir.1990). This "notice defense rule" operates on the principle that it would be futile for the insured to try to meet every technical requirement, if the insurer is already planning to deny coverage. *Id. See also, Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l*, 873 F.Supp. 862, 871 (S.D.N.Y.1995). Although case law on the subject is scarce, at least one decision of the D.C. Court of Appeals suggests that the principle operates in this jurisdiction. *See Boyle v. National Casualty Co.*, 84 A.2d 614, 615 (D.C.1951).

■ In the present case, defendant initially denied coverage on the ground that the PVA suit was not covered under the policy. Defendant did not begin to assert a notice defense—or any other technical defense—until January 6, 1997, nearly five months after it first learned of the PVA claims, and after two previous letters had refused defense based on scope of coverage. Since defendant clearly had no intention of covering the claim, it is estopped from asserting notice as a defense at this time.

■ Even if defendant were not so estopped, the evidence suggests that plaintiffs provided sufficient notice. Defendant first argues that the August 13 notice was late, because plaintiff should have given notice when it learned that PVA was planning a suit—as early as April 1996. This argument is entirely meritless. Plaintiffs were in constant negotiations with PVA and the Justice Department, so they had no reason to believe that litigation was certain until PVA actually filed the complaint. In addition, plaintiffs sought defense only for the litigation itself, not for threat of litigation. The event that triggered coverage—the onset of litigation—did not occur until June 14, 1996, when PVA filed the complaint. Since the Policy requires notice only within 60 days of the event in question, plaintiffs were not required to give notice any earlier. Thus, plaintiffs' notice was timely.

Nor did the Policy require plaintiffs to give notice more quickly than 60 days after June 14. The Policy speaks of "immediate notice," but the only description of that term is "not later than 60 days." At most, the term is ambiguous, which means that the Court must construe it in favor of plaintiffs. *Red Cross,* 816 F.Supp. at 758. Therefore, plaintiffs' notice was timely, because it was given within 60 days of the PVA suit.[8]

Defendant also argues that the notice itself was insufficient, because plaintiffs did not mail copies of the PVA pleadings, and because the August 13 notice did not include a demand for defense. Although the Court finds that plaintiffs have provided some strong evidence on these issues,[9] there may remain some question of fact as to that issue. These issues are not dispositive, however, because the Court finds that defendant is estopped from asserting a notice defense at this time. Therefore, this alleged defect in notice is not sufficient to bar plaintiffs from coverage and to relieve defendant of its contractual duty to defend.

### C. Retention of Counsel

■ Finally, defendant asserts that plaintiffs waived their claim to defense by retaining legal counsel without permission. The policy provides that an insured makes voluntary expenditures at its own cost, and that an insured may select defense counsel only with the consent of the insurer. Policy at 8 ¶3; *Id.* at Endorsement 11. The policy further provides that "any insured choosing to engage its own defense...shall not be covered by this policy." *Id.* at Endorsement 9, ¶ c.

However, while defendant may have an argument that it should not pay full fare for the more expensive firms that plaintiffs hired, they are not relieved of all duties to pay, merely because plaintiffs retained expensive counsel without prior permission. Furthermore, defendant may again be estopped from making this argument, since it did not assert this defense until long after it denied coverage. Finally plaintiffs' retention of counsel was not a completely voluntary decision, since they were forced to begin defending the PVA suit in July of 1996. Indeed, had plaintiffs waited for defendant to act, they would likely have been prejudiced, because defendant did not deny coverage until December, by which time the trial had already finished. Therefore, plaintiffs' unilateral retention of counsel does not bar coverage.

### IV Conclusion

■ The Court finds that defendant was obligated to provide plaintiffs with a defense to all of the claims in the PVA litigation. Although the Policy may not provide coverage for each claim, or for every element of relief sought by PVA, it does provide coverage for some claims, and for some relief. This partial coverage is sufficient to trigger a duty to defend the entire claim. Thus, the Policy obligated United Coastal to defend plaintiff against the PVA lawsuit.

In addition, no act or omission by plaintiffs relieved defendant of this contractual duty. Plaintiffs did not misrepresent the risk of an ADA violation in their application for coverage, nor did they know of the violation at the time. Defendant is estopped from asserting inadequate notice as a defense, and the evidence establishes that plaintiffs provided adequate notice of the PVA claim. Finally, plaintiff did not waive coverage by unilaterally retaining counsel.

Therefore, United Coastal had a contractual duty under the Policy to defend plaintiffs

---

8. It does not matter that plaintiffs did not send in notice themselves, but rather had Ellerbe Becket send it, because the Policy permits notice "by or for the Insured." Furthermore, the August 13, 1996 notice letter states that Johnson & Higgins had received and were passing on notice "on behalf of Ellerbe Becket as well as any of the other defendants who are insureds on your policy." Finally, the issue of whether Johnson & Higgins was authorized to receive notice is not germane, since defendant admits that it received actual notice on August 13.

9. For example, plaintiffs provide evidence to support their claim that they mailed copies of court papers along with their notice. In addition to affidavits, they submit the August 13 letter, which references the "enclosed materials," and the July 14 correspondence to Johnson & Higgins, which was sent by UPS, with a shipping slip that described a bulky mailing. While this evidence is strong, however, it is probably insufficient to succeed on summary judgment.

against the PVA suit. For this reason, plaintiffs are entitled to summary judgment on Counts One and Three of the Complaint.

An order will accompany this opinion.