United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 20, 2001 Decided January 15, 2001 

 No. 00-7259

 Young Women's Christian Association 
 of the National Capital Area, Inc., 
 a District of Columbia Non-Profit Corporation, 
 Appellant

 v.

 Allstate Insurance Company of Canada, 
 a Canadian Corporation, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 94cv00741)

 Bardyl R. Tirana argued the cause and filed the briefs for 
appellant.

 Elizabeth B. Sandza argued the cause for appellees. With 
her on the brief were Michael F. McBride, David M. Ross, 

Ronald W. Fuchs, Richard W. Driscoll, Stuart L. Peacock, 
William H. White Jr., John A. Scaldara and Donald J. 
Walsh.

 Before: Ginsburg, Chief Judge, Rogers and Garland, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: The Young Women's Christian 
Association of the National Capital Area ("YWCA") appeals 
the grant of summary judgment to several insurance compa-
nies, contending principally that the district court erred in its 
choice of law ruling and, alternatively, in its application of 
law, having failed to abide by the language of the insurance 
policies and the applicable rules for construction of insurance 
contracts. We reverse the district court's choice of law ruling 
and its application of law, and we remand the case for 
consideration of exclusions under the policies and related 
issues.

 I.

 On November 30, 1979, YWCA contracted with Tiber Con-
struction Company ("Tiber"), a Virginia corporation, for the 
construction of a new building at 9th and G Streets, N.W., in 
Washington, D.C. By subcontract, dated February 18, 1980, 
Tiber engaged Beer Precast Concrete, Ltd. ("Beer"), of On-
tario, Canada, to furnish and install precast concrete panels 
for the building. Beer cast the panels for the YWCA's 
building in April-September 1980 and delivered and installed 
the panels August-October 1980. Before shipping them to 
the District of Columbia, Beer acid-etched the panels. The 
architect on the project advised Tiber, however, that some of 
the panels were unacceptable because they were chipped, 
warped, cracked, discolored, or without homogenous distribu-
tion of aggregate. Beer agreed to patch the precast panels 
and wash-down all of the panels at all elevations using 
cleaning agents and scrub brushes in an attempt to achieve 
uniformity of the finish. The on-site washing took place 
around October 1980. Nine years later, in late 1989 or early 

1990, the YWCA became aware of imperfections--cracks, 
staining, and blemishes--in the precast concrete panels.

 On August 28, 1990, YWCA filed suit in the United States 
District Court for the District of Columbia against Tiber for 
breach of contract and against Beer for breach of contract, 
breach of warranty, negligence, and misrepresentation. Fol-
lowing the grant of summary judgment to Tiber on Tiber's 
and Beer's cross-claims for contribution and indemnification, 
the parties stipulated that any judgment against Tiber would 
be entered against Beer. The misrepresentation claim was 
dismissed pretrial. On the remaining claims, YWCA present-
ed evidence at trial regarding three causes of the damage to 
the concrete panels. The evidence of YWCA's two experts, 
Mark F. Williams and Bernard Erlin as well as Beer's expert, 
William F. Logan, showed that the primary cause of the 
deterioration of the panels was the introduction of excessive 
chloride ions when Beer improperly acid-etched the panels. 
This exposure to excessive chloride ions caused the steel 
imbedded in the panels to corrode, resulting in the cracking 
of the panels. The deterioration was exacerbated by Beer's 
failures to manufacture the panels with sufficient concrete 
cover over the imbedded steel, and to use galvanized reinforc-
ing mesh, to protect the steel from attack by chloride ions 
where the concrete cover was less than one-and-a-half inches 
thick, as required by the contract specifications and industry 
standards. The corrosion of the imbedded steel and the 
resulting cracking was an ongoing, insidious process; the 
chloride ions slowly advance through the concrete until they 
reach the steel, corroding it on a progressive and continuing 
basis.

 The jury found that Tiber and Beer had breached their 
contract with the YWCA, that Beer was negligent, and that 
YWCA had suffered $4.5 million in damages. The jury also 
found that Tiber and Beer had failed to prove that the YWCA 
knew or reasonably should have known that "there was a 
condition in the panels that would cause a person exercising 
ordinary care to make further inquiry as to the reasons for 
that condition." The district court entered judgment on 

January 31, 1994, for the YWCA in the amount of 
$4,504,978.47 (costs included).

 The YWCA then filed suit, on April 5, 1994, in the District 
Court for the District of Columbia against Beer's seven 
Canadian insurers ("the Insurers") during 1979 to 1991, the 
period spanning the manufacture of the panels to the discov-
ery of the damage:

 Kansa General International Insurance Company 
 ("Kansa") issued a comprehensive general liability policy 
 with a $2 million limit, and an excess umbrella policy for 
 $5 million, for the term from July 31, 1979 to July 31, 
 1980.
 
 Allstate Insurance Company of Canada ("Allstate") 
 issued a comprehensive general liability policy with a $2 
 million limit, and an excess umbrella policy for $5 million 
 for the term from July 31, 1980 to July 31, 1981.
 
 New Hampshire Insurance Company ("New Hamp-
 shire") issued two comprehensive general liability policies 
 with terms of July 31, 1982 to July 31, 1983 and July 31, 
 1983 to July 31, 1984 with limits of $1 million each.
 
 Halifax Insurance Company ("Halifax") issued two 
 comprehensive general liability policies with terms of 
 July 31, 1984 to July 31, 1985 and July 31, 1985 to July 
 31, 1986 with limits of $1 million each.
 
 Norad Reinsurance Company, Ltd. ("Norad") issued a 
 comprehensive general liability policy with a term of July 
 31, 1986 to July 31, 1987 and a limit of $5 million.
 
 Richmond Insurance Company (Barbatos), Ltd. ("Rich-
 mond") issued a policy for the term of July 31, 1987 to 
 July 31, 1988.
 
 American Home Assurance Company ("American 
 Home") issued a comprehensive general liability policy 
 with a term of June 21, 1989 to July 31, 1991 and a limit 
 of $3 million. 
 The YWCA reached a settlement with Allstate, and on May 
30, 1995, the district court dismissed YWCA's claims against 
Allstate. YWCA's suit against Richmond was dismissed. 

The district court entered a default judgment against Norad. 
YWCA was unsuccessful in its effort to collect from Kansa. 
Kansa filed for bankruptcy in December 1994, and on March 
8, 1995, the Superior Court of Quebec ("Quebec Court") 
issued a Winding-up Order. On April 9, 1998, the Canadian 
Liquidator disallowed YWCA's submission of proof of its 
claims against Kansa because (1) there was no injury during 
the policy period within the meaning of Kansa's policies, (2) 
exclusions under the policies were implicated, (3) YWCA 
failed to give timely notice to Kansa of its alleged claims, and 
(4) YWCA did not comply with the Liquidator's request that 
it disclose the actual amount of its alleged damages. When 
YWCA did not, when granted additional time, make the 
requested disclosure, the Quebec Court entered a judgment 
against YWCA on February 2, 1999, on its claims against 
Kansa.

 Meanwhile, in the district court here, on November 21, 
1995, YWCA, Kansa, New Hampshire, and Halifax filed 
cross-motions for summary judgment. On August 12, 1998, 
the Magistrate Judge issued a report and recommendation 
that District of Columbia law should apply to the construction 
of the insurance policies, and that YWCA's and American 
Home's motions for summary judgment should be denied and 
New Hampshire's and Halifax's motions for summary judg-
ment should be granted. By Order dated January 26, 1999, 
the district court rejected the Magistrate Judge's choice of 
law recommendation, concluding instead that Canadian law 
applied.

 Thereafter, the district court granted Kansa's motion to 
dismiss on grounds of comity, and in the alternative granted 
Kansa's motion for summary judgment. The district court 
also granted summary judgment to the three remaining In-
surers. Applying Ontario law to determine whether there 
was coverage under the Insurers' occurrence-based policies, 
the district court identified four relevant triggers of coverage 
under Ontario law. The court rejected the "continuous trig-
ger," which includes all times from exposure to the harm to 
its manifestation, because no Canadian court had applied it. 
It also rejected the "manifestation trigger," for which the 

trigger is the moment at which the damage becomes apparent 
or is discovered, because Canadian courts (other than a 
Quebec trial court), including the Ontario court, had rejected 
it. The district court distinguished Canadian cases that had 
applied an "injury-in-fact trigger," which looks to the time at 
which the damage actually occurred, explaining that both 
Pickford & Black Ltd. v. Canadian General Insurance Co., 
64 D.L.R (3d) 179, 185 (Can. 1976), and Dawson Creek v. 
Zurich Insurance Co., No. 12371, 1998 A.C.W.S.J. LEXIS 
86772, at *24-*25 (B.C. Sup. Ct. Sept. 17, 1998), did not 
involve a single exposure that inevitably caused damage over 
time, but involved both an initial exposure and a later event 
that could be said to have caused the injury. In contrast, the 
court stated that several Canadian courts had applied the 
"exposure trigger," for which the triggering event is the 
exposure to the harm that causes the damage rather than the 
resulting damage to the property.

 The district court then turned to the occurrence-based 
policies at issue. Observing that the terms of the Halifax 
policy speak of "exposure" during the policy period, and 
noting that the acid-etching process was the single moment of 
exposure at which time the damage became inevitable, the 
court found that no triggering event had occurred during 
Halifax's policy period. Rather, the exposure took place dur-
ing the term of Allstate's policy. Finding that the New 
Hampshire and American Home policies did not indicate 
which trigger applies, the court construed the terms of these 
policies, namely, "injury," "destruction," and "damage," to 
refer only to the moment of the initial exposure at which time 
the damage becomes inevitable. Because, under the district 
court's analysis, the acid-etching process was the causative 
event when the damage became inevitable and there was no 
intervening causative event during the New Hampshire and 
American Home policies, it followed that these policies were 
not triggered.

 II.

 On appeal, YWCA contends that the district court erred in 
ruling that Canadian law applies to its claims against the 

Insurers arising from Beer's negligence and breach of con-
tract in the District of Columbia. YWCA contends first, that 
the district court erred in failing to conclude that there was 
no conflict of laws between the District of Columbia and 
Ontario because both apply a continuous trigger. YWCA 
contends alternatively that, under the substantial interests 
test, the correct choice of law is that of the District of 
Columbia where the YWCA building is located, and that 
under District of Columbia law, a continuous trigger applies 
to comprehensive general liability policies when the injury is 
continuous or progressive. See Wrecking Corp. of Am., Va., 
Inc. v. Ins. Co. of N. Am., 574 A.2d 1348, 1350 (D.C. 1990). 
Alternatively again, YWCA contends that even if Ontario law 
applies, the district court erred in relying on law of the 
Province of Saskatchewan that conflicts with the law of 
Ontario, explaining that in International Comfort Products 
Corp. v. Royal Insurance Company of Canada, No. 
99-177332, Mar. 20, 2000 A.C.W.S.J. LEXIS 48324, at *12 
(Ont. Sup. Ct. 2000), Ontario rejected the exposure trigger 
theory adopted in University of Saskatchewan v. Fireman's 
Fund Insurance Company of Canada, No. 2172, 1997 
A.C.W.S.J. LEXIS 161238 (Sask. Ct. App. Oct. 10, 1997). 
YWCA maintains also that Ontario's application of the contin-
uous trigger is consistent with the leading decision of the 
Supreme Court of Canada on the construction of insurance 
policies, Reid Crowther & Partners Ltd. v. Simcoe & Erie 
General Insurance Co., 99 D.L.R. (4th) 741 (Can. 1993), and 
that the district court failed to apply this precedent when it 
subjected all of the policies to an exposure trigger theory 
even though the language of the policies insures against 
occurrences.

 Because there is diversity of citizenship among the parties 
to this litigation, the law of the forum state supplies the 
choice of law standards. Klaxon Co. v. Stentor Elec. Mfg. 
Co., 313 U.S. 487, 496 (1941). Under District of Columbia 
law, the court must first determine if there is a conflict 
between the laws of the relevant jurisdictions. Eli Lilly & 
Co. v. Home Ins. Co., 764 F.2d 876, 882 (D.C. Cir. 1985) 
(citing Fowler v. A & A Co., 262 A.2d 344, 348 (D.C. 1970)); 
Duncan v. G.E.W., Inc., 526 A.2d 1358, 1363 (D.C. 1987). 

Only if such a conflict exists must the court then determine, 
pursuant to District of Columbia choice of law rules, which 
jurisdiction has the "more substantial interest" in the resolu-
tion of the issues. See Nationwide Mut. Ins. Co. v. Richard-
son, 270 F.3d 948, 953 (D.C. Cir. 2001); Eli Lilly & Co., 764 
F.2d at 882; Greycoat Hanover F St. Ltd. P'ship v. Liberty 
Mut. Ins. Co., 657 A.2d 764, 767-78 (D.C. 1995).

 It is unnecessary to engage in a conflict of laws analysis. 
Both YWCA and the Insurers agree that the relevant juris-
dictions are the District of Columbia and Ontario. Examina-
tion of both forums' laws reveals that no conflict of laws exists 
because both would apply a continuous trigger to the occur-
rence-based policies where the damage can be characterized 
as being continuous or progressive.1

__________
 1 In ruling that Canadian law applied, the district court relied 
upon Liberty Mutual Insurance Co. v. Travelers Indemnity Co., 78 
F.3d 639 (D.C. Cir. 1996). In Liberty Mutual, the court examined 
which state law should govern a liability insurance policy and stated 
that "[u]nder District law, insurance contracts are governed by the 
substantive law of the state in which the policy is delivered." Id. at 
642; see also CSX Transp., Inc. v. Commercial Union Ins. Co., 82 
F.3d 478, 482 (D.C. Cir. 1996) (citing Liberty Mutual with approv-
al). It is not altogether clear that Liberty Mutual correctly charac-
terized the District of Columbia's choice of law rules. This court's 
decision in Nationwide Mutual Insurance Co., applying the District 
of Columbia Court of Appeals decision in Greycoat Hanover sug-
gests that the District of Columbia applies the law of the jurisdic-
tion with the more substantial interest in the litigation, in consider-
ing what law to apply to insurance policies. Nationwide Mut. Ins. 
Co., 270 F.3d at 953; cf. Ideal Elec. Sec. Co. v . Int'l Fid. Ins. Co., 
129 F.3d 143, 148 (D.C. Cir. 1997). Liberty Mutual addressed 
neither Greycoat Hanover nor the more substantial interest test, 
relying instead on D.C. Court of Appeals decisions involving life 
insurance policies rather than liability policies. Liberty Mut., 78 
F.3d at 642 (citing Levin v. John Hancock Mut. Life Ins. Co., 41 
A.2d 841 (D.C. 1945), and Raley v. Life & Cas. Ins. Co. of Tenn., 
117 A.2d 110 (D.C. 1955)). Those District of Columbia cases are 
specific, however, to life insurance policies and rely on Supreme 
Court cases holding that the place of delivery of life insurance 

 A.

 Neither the highest court in Ontario nor the Supreme 
Court of Canada has addressed which trigger theory applies 
to occurrence-based policies. But in Reid Crowther & Part-
ners Ltd. v. Simcoe & Erie General Insurance Co., 99 D.L.R. 
(4th) 741 (Can. 1993), the Supreme Court of Canada set forth 
general principles for interpreting insurance contracts that 
direct courts to the language of the particular insurance 
policy:

 In each case the courts must examine the provisions of 
 the particular policy at issue (and the surrounding cir-
 cumstances) to determine if the events in question fall 
 within the terms of coverage of that particular policy.... 
 In each case, the courts must interpret the provisions of 
 the policy at issue in light of general principles of inter-
 pretation of insurance policies, including, but not limited 
 to:
 
 (1) the contra proferentem rule;
 
 (2) the principle that coverage provisions should be 
 construed broadly and exclusion clauses narrowly; and
 
 (3) the desirability, at least where the policy is ambig-
 uous, of giving effect to the reasonable expectations of 
 the parties. 
Id. at 751-52.

 Examination of the language in the Insurers' policies indi-
cates the appropriateness of applying a continuous trigger. 
The Halifax policies cover "occurrences" and define an "oc-
currence" as including "a continuous or repeated exposure 
during the Policy Period to a condition or conditions which 
__________
polices determines what state law should apply. See Mut. Life Ins. 
Co. of N.Y. v. Johnson, 293 U.S. 335, 339 (1934); Northwestern 
Mut. Life Ins. v. McCue, 223 U.S. 234, 248 (1912); Mut. Life Ins. 
Co. of N.Y. v. Cohen, 179 U.S. 262, 264 (1900).

 The instant appeal, however, does not present the occasion to 
decide whether Liberty Mutual correctly characterized District of 
Columbia choice of law rules because it is unnecessary to engage in 
a conflict of laws analysis.

result in injury to or destruction of property neither expected 
nor intended from the standpoint of the Insured." Similarly, 
the American Home policy covers "accidents" and defines 
"accident" as including "continuous or repeated exposure to 
conditions which results in property damage neither expected 
nor intended from the standard point of the Insured." The 
plain terms of these policies support application of the contin-
uous trigger where, as here, the exposure to the damaging 
excessive chloride ions was continuous in nature. Although 
the Insurers, like the district court, take the position that 
there was only a single exposure that caused continuous 
damage, this characterization of the nature of the damage is 
belied by undisputed evidence describing the damage. That 
evidence showed that the damage was the result of continued 
exposure to excessive chloride ions that migrate through the 
concrete, and that the initial exposure to the chloride ions 
thus resulted in continuous exposure to those same ions as 
they migrated through the concrete and slowly corroded the 
steel.

 In addition, the language of the New Hampshire policies 
also indicates the appropriateness of applying the continuous 
trigger. The New Hampshire policies cover "physical injury 
to or destruction of property which occurs during the policy 
period," and define "occurrence" as including "injurious expo-
sure to condition which results, during the policy period, in 
bodily injury or property damage neither expected nor in-
tended from the standpoint of the Insured." The district 
court interpreted this language as setting forth an exposure 
trigger. Yet the policy language provides that it is the 
property damage and not the exposure to it that must occur 
during the policy period. The language is thus consistent 
with the continuous trigger theory, which defines damage 
broadly to include the entire process of damage from expo-
sure to manifestation when the damage is of a continuous and 
progressive nature. Cf. Keene Corp. v. Ins. Co. of N. Am., 
667 F.2d 1034, 1045-47 (D.C. Cir. 1981).

 Even if the Insurers' policies might reasonably be read 
differently, the contract interpretation principles set forth by 
the Supreme Court of Canada point to application of the 

continuous trigger. First, the policy is to be construed 
against the drafters. See Reid Crowther, 99 D.L.R. (4th) at 
751-53. Neither Halifax, nor New Hampshire, nor American 
Home contend in their brief that the contra proferentem rule 
is inapplicable to its policy because it did not draft it. Nor do 
they contend that the language of the policies was imposed by 
statute. Second, even if there is doubt as to which party 
drafted the policies, the coverage provisions are to be inter-
preted broadly. Id. Thus, under Canadian principles of 
contract interpretation, the court is to interpret the policies to 
maximize coverage, which also points to application of the 
continuous trigger theory.

 This result is consistent with the law of Ontario, which 
recognizes a continuous trigger theory. In a case not cited 
by either side in their briefs, an Ontario Superior Court judge 
in Alie v. Bertrand & Frere Construction Co., No. 2104-1992, 
2000 A.C.W.S.J. LEXIS 56664 (Ont. Sup. Ct. Apr. 17, 2000), 
provided a thorough and persuasive analysis of the relevant 
considerations in applying trigger theories. In Alie, the court 
considered which of the four triggers to apply for coverage of 
property damage consisting of continuous deterioration of the 
foundations of homes caused by the use of fly ash in the 
concrete. Id. at *19-*20, *190-*91. The court rejected the 
exposure theory as being inconsistent with the language of 
the policies. Id. at *194. The policies provided coverage for 
property damage occurring during the policy period. Id. 
Because the damage was continuous, the court rejected limit-
ing coverage to only the policy that covered the period of 
exposure. Id. The court rejected the manifestation theory, 
as being inconsistent with the policies' language, which focus-
es on the damage and not the discovery of the damage. Id. 
at *198. The court approved of the injury-in-fact theory 
because it was most consistent with the language of the 
policies. Id. at *199-*200. Nonetheless, recognizing the 
practical difficulty of determining when the damage actually 
occurred because it was progressive over time, id. at *200-
*01, the court adopted a combination of the injury-in-fact and 
the continuous triggers, applying the principle that "[a]ll 
carriers who were on the risk from the inception of harm to 

the time the loss was no longer contingent should be liable to 
the insured." Id. at *203 (quoting Zurich Ins. Co. v. Trans-
america Ins. Co., 34 Cal. Rptr. 2d 913, 922 (Cal. Ct. App. 
1994), superseded by 38 Cal. Rptr. 2d 345 (Cal. 1995)); id. at 
*205-*06. The court reasoned that because the injury was 
ongoing, this combined approach was necessary in order to 
apportion the damage equitably over time, id. at *204, that 
this theory was most consistent with the policy language, id. 
at *206, and that this theory was consistent with the intention 
of the parties, id. at *204-*06.

 The Insurers' post-argument submissions do not persuade 
us of any reason to doubt the Alie judge's analysis of Ontario 
law. First, although Alie is a trial court decision currently on 
appeal, that it represents persuasive authority as to which 
trigger Ontario law would apply is reflected in International 
Comfort Products Corp. v. Royal Insurance Company of 
Canada, No. 99-177332, 2000 A.C.W.S.J. LEXIS 48324 (Ont. 
Sup. Ct. Mar. 20, 2000), in which another Ontario trial judge 
had previously adopted the continuous trigger, reasoning that 
the continuous nature of the damage made it difficult to 
determine when damage occurred during the policy periods. 
Id. at *12. The Insurers' attempt to distinguish Internation-
al Comfort as applying only to the broader duty to defend 
rather than the duty to indemnify misses the mark. They 
rely on St. Paul Fire and Marine Insurance Co. v. Durabla 
Canada Ltd., 29 O.R. (3d) 737 (Ont. Ct. App. 1996), in which 
the Ontario Court of Appeals held that because the duty to 
defend is broader than the duty to indemnify it was unneces-
sary to determine which trigger to apply in determining 
whether there was a duty to defend. Id. at 739. However, 
the court in International Comfort was not deciding whether 
the insurers had a duty to defend; the insurers conceded this. 
Int'l Comfort, 2000 A.C.W.S.J. LEXIS 48324, at *11. Rather, 
the question before the court was how to apportion the costs 
of the defense among the insurers. Id. at *11-*12. Indeed, 
the court distinguished Durabla on this ground. Id. Thus, 
although International Comfort involved the duty to defend, 
there is no indication in the opinion that, in determining 

which trigger to apply, the court viewed the insurers' duty as 
being any broader than in an indemnity case.

 Second, contrary to the Insurers' contention, Alie does not 
conflict with Sullivan Entertainment Inc. v. General Acci-
dent Assurance Company of Canada, No. RE 7657/97 1998 
Ont. Sup. C.J. LEXIS 482 (May 29, 1998), an Ontario trial 
court opinion rejecting the manifestation trigger. Id. at *17-
*21. The damage in Sullivan was not of a continuous and 
progressive nature and hence was complete before the insur-
er came to the risk. Thus, the court had no occasion to 
consider whether to apply the continuous trigger. See id. at 
*1.

 Third, Alie is not suspect, as the Insurers maintain, for 
failing to adopt the holding in Cansulex Ltd. v. Reed Sten-
house Ltd., 1986 A.C.W.S.J. LEXIS 30665 (B.C. Sup. Ct. Mar. 
10, 1986), which the Insurers characterize as adopting the 
exposure trigger. Although Cansulex held that the damage 
began upon exposure, triggering coverage, id. at *61, *72-
*74, it did not have occasion to determine whether the 
continuous process of damage would have also triggered 
coverage under future policy periods, and thus is not inconsis-
tent with the adoption of the continuous trigger.

 Fourth, although the Insurers urge this court in both their 
brief and post-argument submissions to follow the district 
court in relying on University of Saskatchewan v. Fireman's 
Fund Insurance Company of Canada, No. 2172 1997 
A.C.W.S.J. LEXIS 161238 (Sask. Ct. App. Oct. 10, 1997), in 
which the Saskatchewan Court of Appeal overturned the trial 
court's adoption of the manifestation theory, id. at *29, we 
decline to do so. The court of appeal held that the policy 
language did not support the manifestation theory because it 
refers to damage during the policy period and not the "dis-
covery" of damage, id. at *23; that the manifestation theory 
is inconsistent with the concept of risk because it allows 
coverage even though the process of damage begins and the 
ultimate damage becomes inevitable before the insurer comes 
on the risk, id. at *25; and that if an insurer covered damage 
that occurred before it came on the risk, such coverage would 
be in the nature of warranty and not indemnity, id. at *27. 

University of Saskatchewan is distinguishable from the in-
stant case in a material way. Although it involved continuous 
and progressive damage, id. at *5-*6, the damage was com-
plete before the insurer came on the risk, id. at *20, causing 
the court to reject application of the continuous trigger 
theory on this factual basis. Id. at *20. By contrast, the 
damage at issue, while inevitable from the date of Beer's acid-
etching of the concrete panels, continued through the policy 
period of each of the Insurers. The court of appeal's rejec-
tion of the manifestation theory as contrary to the concept of 
risk is inapplicable where unknown and continuing damage 
occurs during the policy period. Because in University of 
Saskatchewan the damage did not progress into the policy 
period, it provides no guidance as to whether a continuous 
trigger should apply. Indeed, the court of appeal stated in 
University of Saskatchewan that all four trigger theories 
were not before it; rather, it was considering only whether 
the manifestation trigger theory should apply. Id. at *19-
*20. Moreover, whatever the merits of this case may be for 
the Province of Saskatchewan, the University of Saskatche-
wan is not binding authority for the highest court of Ontario. 
R. v. Wolf, 2 S.C.R. 107 (Can. 1974). The appellate court of 
Ontario is only bound by decisions of the Supreme Court of 
Canada, id., which has not expressly adopted the exposure 
trigger. Nor have the Insurers suggested why it would be 
prudent to rely on the Supreme Court of Canada's non-merits 
dismissal of the appeal in University of Saskatchewan as an 
implicit approval of its holding.

 Nothing in the cases from the Supreme Court of Canada, 
the courts of Ontario, nor any relevant statute indicates that a 
continuous trigger theory is disfavored in Ontario. Further-
more, the Supreme Court of Canada has stated that insur-
ance policies, to the extent they are ambiguous, are to be 
construed against the insurers and broadly in favor of cover-
age. Accordingly, in light of Ontario law and the language of 
the policies, where the nature of the damage is continuous, 
the continuous trigger applies.

 B.

 Our analysis of District of Columbia law is to the same 
effect. In Wrecking Corporation of America, Virginia, Inc. 
v. Insurance Company of North America, 574 A.2d 1348 
(D.C. 1990), the D.C. Court of Appeals adopted the manifesta-
tion trigger as a general rule, noting that "the prevailing rule 
is that 'property damage occurs' at the time the damage is 
discovered or when it has manifested itself." Id. at 1350. 
Relying on this holding in contending that District of Colum-
bia law applies a manifestation trigger, the Insurers fail to 
observe that in Wrecking the D.C. Court of Appeals recog-
nized an exception to this general rule when the damage to 
the property can be characterized as "continuous or progres-
sive." Id. Unlike in Wrecking, in which there was no 
evidence that the property damage was of a "continuous and 
progressive" nature, the evidence of Beer's negligence estab-
lishes that the corrosion caused by the exposure to excessive 
chloride ions was of a continuous and progressive nature. As 
such, this evidence suffices to bring the instant case within 
the exception recognized in Wrecking. Accordingly, as under 
Ontario law, District of Columbia law applies the continuous 
trigger where the damage is of a continuous nature. Fur-
thermore, to the extent the language of the policies is ambig-
uous, District of Columbia law interprets ambiguities against 
the insurers. Chase v. St. Farm Fire & Cas. Co., 780 A.2d 
1123, 1127 (D.C. 2001). Thus, under District of Columbia law, 
given the language of the policies and the continuous nature 
of the damage, the continuous trigger applies.

 III.

 On appeal, the Insurers have pointed to no evidence to 
create a dispute as to a genuine issue of material fact 
regarding YWCA's evidence that the exposure to the chloride 
ions occurred in 1980 and that the damage caused by the 
excessive chloride ions began to manifest itself around 
November-December 1989 or early 1990. Applying the con-
tinuous trigger to the Insurers' policies, there is coverage 
under New Hampshire's policies, Halifax's policies, and 

American Home's policy. Accordingly, we reverse the dis-
trict court's grant of summary judgment to these Insurers, 
and remand the case to the district court to address their 
claims that coverage is precluded by exclusions in the policies.

 To the extent YWCA challenged the district court's exten-
sion of comity to the Quebec Court's resolution of YWCA's 
claims against Kansa in its opening brief, YWCA contends 
only that the district court acted contrary to the Ontario 
Court's view that one court should decide all of the claims 
against the Canadian insurers. No argument is made that 
the Ontario Court's reasoning for staying Halifax's declarato-
ry judgment action was binding on the district court, and the 
mere existence of this reasoning does not defeat the extension 
of comity to the decision of the Quebec Court. The Quebec 
Court considered all of YWCA's present claims on the merits, 
and YWCA fails to point to a distinction between the United 
States and Canadian justice systems that would weigh against 
comity. See Clarkson Co., Ltd. v. Shaheen, 544 F.2d 624, 
629-30 (2d Cir. 1976); see also Canada S. Ry. Co. v. Gebhard, 
109 U.S. 527 (1883). Accordingly, we affirm the district 
court's ruling on comity.

 Finally, because the issues of whether the Insurers are 
liable to YWCA for breach of their duty to defend and 
attorneys' fees turn on the applicability of the policy exclu-
sions and the district court did not address these issues, we 
remand these issues as well.